**No. 21-2425**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SIERRA CLUB; APPALACHIAN VOICES; CHESAPEAKE CLIMATE
ACTION NETWORK; WILD VIRGINIA; PRESERVE CRAIG, INC.; BLUE
RIDGE ENVIRONMENTAL DEFENSE LEAGUE; PRESERVE FRANKLIN;
PRESERVE BENT MOUNTAIN; PRESERVE GILES COUNTY; and
NATURAL RESOURCES DEFENSE COUNCIL, INC.
*Petitioners*

v.

STATE WATER CONTROL BOARD; HEATHER WOOD, in her official
capacity as Chair of the State Water Control Board; LOU ANN JESSEE-
WALLACE, in her official capacity as Vice-Chair of the State Water Control
Board; JILLIAN COHEN, in her official capacity as a Member of the State Water
Control Board; TIMOTHY G. HAYES, in his official capacity as a Member of the
State Water Control Board; PAULA HILL JASINSKI, in her official capacity as a
Member of the State Water Control Board; RYAN C. SEIGER, in his official
capacity as a Member of the State Water Control Board; DR. JACK O. LANIER,
in his official capacity as a Member of the State Water Control Board; VIRGINIA
DEPARTMENT OF ENVIRONMENTAL QUALITY; MICHAEL ROLBAND, in
his official capacity as Director of the Virginia Department of Environmental
Quality; and DAVID L. DAVIS, in his official capacity as Director of the Office of
Wetlands and Stream Protection, Virginia Department of Environmental Quality;
*Respondents*

and

MOUNTAIN VALLEY PIPELINE, LLC
*Intervenor-Respondent*

On Petition for Review from the
State Water Control Board's and Virginia Department of Environmental Quality's
VWP Individual Permit Number 21-0416

**PETITIONERS' FINAL OPENING BRIEF**

DEREK O. TEANEY
BENJAMIN A. LUCKETT
ELIZABETH A. BOWER
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email:     dteaney@appalmad.org
*Counsel for Sierra Club; Appalachian
Voices; Chesapeake Climate Action
Network; Wild Virginia; Preserve
Craig, Inc.; Blue Ridge Environmental
Defense League; Preserve Franklin;
and Natural Resources Defense
Council, Inc.*

GREGORY BUPPERT
SPENCER GALL
CLAIRE HORAN
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
Telephone: (434) 977-4090
Email:     sgall@selcva.org
*Counsel for Preserve Bent Mountain
and Preserve Giles County*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2425__        Caption: __Sierra Club, et al. v. State Water Control Bd., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Sierra Club__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                            ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date:         12/30/2021

Counsel for: Sierra Club

Print to PDF for Filing      Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2425__        Caption: __Sierra Club, et al. v. State Water Control Bd., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Appalachian Voices__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date: 12/30/2021

Counsel for: Appalachian Voices

Print to PDF for Filing      Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2425__      Caption: __Sierra Club, et al. v. State Water Control Bd., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Chesapeake Climate Action Network__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date: _____12/30/2021_____

Counsel for: Chesapeake Climate Action Network

Print to PDF for Filing      Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-2425__          Caption: __Sierra Club, et al. v. State Water Control Bd., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Wild Virginia__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
       If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney        Date:    12/30/2021

Counsel for: Wild Virginia

| Print to PDF for Filing | Reset Form |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-2425_          Caption: _Sierra Club, et al. v. State Water Control Bd., et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Preserve Craig, Inc._
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date:    12/30/2021

Counsel for: Preserve Craig, Inc.

Print to PDF for Filing          Reset Form

- 2 -
— x —

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _21-2425_          Caption: _Sierra Club, et al. v. State Water Control Bd., et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Blue Ridge Environmental Defense League_
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐YES ☑NO
      If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ Derek O. Teaney                                    Date:          12/30/2021

Counsel for:  Blue Ridge Envtl. Defense League

[ Print to PDF for Filing ]          [ Reset Form ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-2425__        Caption: _Sierra Club, et al. v. State Water Control Bd., et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Preserve Franklin_
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?        ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?        ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date:    12/30/2021

Counsel for: Preserve Franklin

- 2 -

Print to PDF for Filing      Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-2425__     Caption: __Sierra Club et al. v. State Water Control Board et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Preserve Bent Mountain__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gregory Buppert                    Date:    January 3, 2022

Counsel for: Preserve Bent Mountain

Print to PDF for Filing        Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2425__         Caption: __Sierra Club et al. v. State Water Control Board et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Preserve Giles County__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                              ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gregory Buppert                        Date: ____January 3, 2022____

Counsel for: Preserve Giles County

Print to PDF for Filing        Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-2425__          Caption: __Sierra Club, et al. v. State Water Control Bd., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Natural Resources Defense Council, Inc.__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO


2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Derek O. Teaney                    Date: 1/18/2022

Counsel for: Natural Resources Defense Council

Print to PDF for Filing          Reset Form

# **Table of Contents**

CORPORATE DISCLOSURES ……………………………………………..i

TABLE OF CONTENTS ……………………………………………xxi

TABLE OF AUTHORITIES ……………………………….......………..xxiii

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION ..............................................................3

STATEMENT OF ISSUES.............................................................................7

STATEMENT OF THE CASE .......................................................................8

   Legal Framework ........................................................................................8

   Statement of Facts ....................................................................................12

      MVP's Original Plan ...........................................................13

      NWP 12 ................................................................................14

      "Well Suited for Conventional Bores" ...............................14

      MVP's Current Plan and CWA §401 Application ...................16

SUMMARY OF THE ARGUMENT ...........................................................18

ARGUMENT ................................................................................................27

   Standard of Review ..................................................................................27

   Discussion of the Issues ...........................................................................28

   I.   THE AGENCIES UNLAWFULLY REFUSED TO EVALUATE ALTERNATIVE CROSSING LOCATIONS. ............................................28

     A.  The Agencies Misconstrued Virginia Law. .............................................29

      1.  Neither Section 81(F) Nor Section 21(D)(2) Applies To The Certification Of The Pipeline's Instream Construction. .....................31

      2.  Neither Section 81(F) Nor Section 21(D)(2) Abrogates The Agencies' Authority Or Obligation To Deny §401 Certification Of Pipeline Crossing Locations That Are Not The LEDPA. ....................34

      3.  The Agencies' Reliance On Section 21(D)(2) And Section 21(J)(2) Are Impermissible Post-Hoc Rationalizations. ....................................38

     B.  The Agencies' Legal Errors Were Prejudicial. ........................................41

II.   THE AGENCIES' BLIND ACCEPTANCE OF MVP'S CROSSING-METHOD PREFERENCES WAS ARBITRARY AND CAPRICIOUS. ..................................................................44

   A. The Agencies Neither Evaluated MVP's Claims About Crossing Methods Nor Explained Their Own Conclusions. ...................................45

   B. The Agencies Failed To Address An Important Aspect Of The Problem By Ignoring MVP's Inconsistent Statements About Crossing-Method Practicability. ................................................50

III.  THE AGENCIES' TREATMENT OF VIRGINIA'S NARRATIVE WATER QUALITY CRITERIA WAS ARBITRARY AND CAPRICIOUS. ..................................................................52

   A. The Agencies Failed To Address An Important Aspect Of The Problem By Refusing To Predict Whether MVP's Construction Would Comply With Virginia's Narrative Criteria. ..........................54

   B. The Agencies' Claimed Lack Of Methods To Evaluate Compliance With Virginia's Narrative Criteria Runs Counter To The Record. ..........56

CONCLUSION ..............................................................................60

REQUEST FOR ORAL ARGUMENT ...........................................61

CERTIFICATE OF COMPLIANCE .............................................62

CERTIFICATE OF SERVICE ........................................................63

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003) ............................................................... 3

*Am. Paper Inst., Inc. v. EPA*,
  996 F.2d 346 (D.C. Cir. 1993) .................................................. 26, 54

*Colo. Fire Sprinkler, Inc. v. NLRB*,
  891 F.3d 1031 (D.C. Cir. 2018) ......................................... 25, 26, 52

*Constitution Pipeline Co. v. N.Y. State Dep't of Envtl. Conservation*,
  868 F.3d 87 (2d Cir. 2017) ................................................................ 37

*Cowpasture River Pres. Ass'n v. U.S. Forest Serv.*,
  911 F.3d 150 (4th Cir. 2018), *rev'd on other grounds sub nom*
  *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S.Ct. 1837 (2020) ...... 36

*Fred Meyer Stores, Inc. v. NLRB*,
  865 F.3d 630 (D.C. Cir. 2017) ................................................. 28, 44

*Friends of Buckingham v. State Air Pollution Control Bd.*,
  947 F.3d 68 (4th Cir. 2020) ................................... 22, 24, 28, 38, 45, 49

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) ................................................. 24, 44, 48

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005) ............................................................................ 36

*King v. Burwell*,
  758 F.3d 358 (4th Cir. 2014), *aff'd* 576 U.S. 473 (2015) ................ 41

*Littlefield v. Mashpee Wampanoag Indian Tribe*,
  951 F.3d 30 (1st Cir. 2020) .............................................................. 33

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................ 7

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ......................................................................47

*Milk Industry Foundation v. Glickman*,
132 F.3d 1467 (D.C. Cir. 1998) ..................................................55

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................52

*Mountain Valley Pipeline, LLC v. N.C. Department of Environmental Quality*,
990 F.3d 818 (4th Cir. 2021)......................................................9, 37

*Nat. Res. Def. Council v. EPA*,
16 F.3d 1395 (4th Cir. 1993) ..................................................11, 54

*Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ......................................................11

*Ohio Valley Envtl. Coalition v. Fola Coal Co.*,
845 F.3d 133 (4th Cir. 2017) ......................................................57

*Ohio Valley Envtl. Coalition v. Pruitt*,
893 F.3d 225 (4th Cir. 2018) ......................................................57

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010)......................................................56

*Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*,
268 F.3d 255 (4th Cir. 2001) ........................................................4

*PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*,
511 U.S. 700 (1994) ......................................................................54

*S. Appalachian Mountain Stewards v. Red River Coal Co.*,
420 F.Supp.3d 481 (W.D. Va. 2019), *aff'd*, 992 F.3d 306 (4th Cir. 2021)..11, 57

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ..............................................................20, 28, 43

*Sierra Club v. State Water Control Board*,
898 F.3d 383 (4th Cir. 2018)..............................................1, 27, 55

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   No. 20-2039(L) (4th Cir. 2020) ............................................................ 14

*Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club I*"),
   909 F.3d 635 (4th Cir. 2018) .................................................... 13, 14, 28

*Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club II*"),
   981 F.3d 251 (4th Cir. 2020) ................................ 3, 12, 13, 14, 15, 51

*Sierra Club v. U.S. Dep't of Interior*,
   899 F.3d 260 (4th Cir. 2018) .......................... 25, 28, 44, 45, 49, 50

*Sierra Club v. U.S. Forest Serv.*,
   897 F.3d 582 (4th Cir. 2018) ................................ 26, 28, 54, 56

*United States v. Bowen*,
   100 U.S. 508 (1879) ............................................................ 33

*United States v. Campbell*,
   22 F.4th 438 (4th Cir. 2022) .............................................. 41

**State Cases**

*Bridgewater Mfg. Co. v. Funkhouser*,
   79 S.E. 1074 (Va. 1913) ....................................................... 36

*Cuccinelli v. Rector, Visitors of Univ. of Virginia*,
   722 S.E.2d 626 (Va. 2012) ..................................................... 30

*Eberhardt v. Fairfax County Employees' Ret. Sys. Bd. of Trustees*,
   721 S.E.2d 524 (Va. 2012) ..................................................... 30

*Finnerty v. Thornton Hall, Inc.*,
   593 S.E.2d 568 (Va. App. 2004) ............................................ 36

*Sims Wholesale Co. v. Brown-Forman Corp.*,
   468 S.E.2d 905 (Va. 1996) ..................................................... 30

**Constitutional Provisions**

United States Constitution Article III ........................................... 3

## Federal Statutes

5 U.S.C. § 706(2)(A) ...............................................................27

15 U.S.C. § 717b(d) ...............................................................36

15 U.S.C. § 717f .....................................................................3

15 U.S.C. § 717f(c) ................................................................32

15 U.S.C. § 717r(d)(1) ...............................................3, 8, 27, 28

33 U.S.C. §1313 .....................................................................43

33 U.S.C. § 1341 ..................................................................1, 3

33 U.S.C. § 1341(a) ..........................................................36, 53

33 U.S.C. § 1341(a)(1) ............................................................8

33 U.S.C. § 1344(a) ................................................................1

## State Statutes

Senate Bill 950, 2018 Va. Acts 962-66 ................8, 9, 10, 20, 31, 32, 33, 34, 40, 41

Article 2.6 of State Water Control Law,
    *codified at* Va. Code § 62.1-44.15:80-84 ..............................9, 20, 31, 32, 33, 34

Va. Code § 62.1-44.15:02(P)..................................................22, 29, 38, 49

Va. Code § 62.1-44.15:20(D) ...................................................8

Va. Code §62.1-44.15:21........................................................39

Va. Code § 62.1-44.15:21(D)(2) .................9, 19, 20, 21, 29, 30, 31, 32, 33, 34, 36

Va. Code §62.1-44.15:21(J) ..................................................9, 34

Va. Code § 62.1-44.15:21(J)(1)...............................................10

Va. Code § 62.1-44.15:21(J)(2)................................................23, 40, 41

Va. Code § 62.1-44.15:80.......................................................32

Va. Code § 62.1-44.15:81...................................................................35, 39

Va. Code § 62.1-44.15:81(F)..............................19, 20, 21, 29, 31, 34, 35

Va. Code § 62.1-44.15:81(H)......................................................21, 22, 35

## Regulations

9 Va. Admin. Code § 25-210-10(B).........................................................40

9 Va. Admin. Code § 25-210-80(B)(1)(g)..........................10, 19, 23, 24, 29, 41, 44

9 Va. Admin. Code § 25-210-230(A)(3).........................10, 21, 29, 34, 38

9 Va. Admin. Code § 25-260-20(A).....................................11, 53, 54, 56

*Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material*, 40 C.F.R. Part 230 ..........................................................9

## Federal Register

49 Fed. Reg. 37,998 (Sept. 26, 1984)....................................................11

## Other Authorities

American Heritage Dictionary (4th ed. 2000)..................................21, 35

Bryan A. Garner, *A Dictionary of Modern American Usage* (1998) .....................33

## **INTRODUCTION**

Three years after construction began on the Mountain Valley Pipeline (the "Pipeline"), Virginia's environmental agencies were finally tasked with evaluating whether the impacts from Pipeline construction in Virginia's streams and wetlands would violate water quality laws in the Commonwealth. They came up short.

This case follows years of failed efforts by Intervenor Mountain Valley Pipeline, LLC ("MVP") to build the Pipeline's waterbody crossings using a streamlined general permit with relatively lax oversight of project-specific impacts. Last year, after that plan ran into repeated legal trouble, MVP decided to apply for a project-specific individual permit under Section 404(a) of the Clean Water Act ("CWA"), 33 U.S.C. §1344(a), that would allow it to trench through hundreds of waterbodies standing in the way of its proposed Pipeline.

MVP's strategy adjustment required it to apply for a certification from Virginia under Section 401 of the CWA, 33 U.S.C. §1341 (AD009-11), that trenching through hundreds of the Commonwealth's streams and wetlands would not harm state water quality. Virginia previously certified the fast-track general permit that MVP originally hoped to use, and Virginia also previously issued MVP a water quality certification for so-called "upland" construction activities outside streams and wetlands, which came before this Court in *Sierra Club v. State Water Control Board*, 898 F.3d 383 (4th Cir. 2018). But until MVP's strategy adjustment,

Virginia was never asked to evaluate whether MVP's instream work would comply with the Virginia regulations governing direct impacts to streams and wetlands. Among other things, those regulations required MVP to demonstrate that both the proposed *locations* and *methods* for its waterbody crossings are the least environmentally damaging practicable alternatives—a CWA term of art known by the acronym "LEDPA."

In late 2021, Respondent State Water Control Board (the "Board"), acting on a recommendation from Respondent Virginia Department of Environmental Quality ("DEQ") (collectively, the "Agencies"), voted to grant MVP's application and issue a water quality certification for the Pipeline's instream construction (the "Certification"). AR020155-232 (JA0001-78).

This case is not about dissecting the Agencies' technical conclusions because the Agencies did not reach any. Instead, they refused outright to evaluate whether MVP's proposed crossing *locations* are the LEDPA, justifying their refusal with a misinterpretation of Virginia law. They uncritically accepted that MVP's preferred crossing *methods* are the LEDPA because the responsible DEQ staffer felt he was unqualified to do any more. And they refused to address whether MVP's instream construction would violate Virginia's narrative water quality standards because (they said) they could not make a prediction, even though §401 certifications are

inherently predictive and the Agencies had the necessary tools at their disposal. The Certification should be vacated.

## STATEMENT OF JURISDICTION

On December 20, 2021, DEQ finalized the issuance of the Certification previously approved by the Board on December 14, 2021. AR020155-232 (JA0001-78). On December 22, 2021, Petitioners filed a timely petition for review of the Certification. ECF #3.

The Pipeline is subject to Section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. §717f, and is being constructed in this Circuit, *Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club II*"), 981 F.3d 251, 260 n.6 (4th Cir. 2020). The Certification is a state agency approval required under Federal law. 33 U.S.C. §1341 (AD009-11). Accordingly, this Court has jurisdiction under NGA Section 19(d)(1). 15 U.S.C. §717r(d)(1) (AD007).

Petitioners have standing under Article III of the United States Constitution. For Article III standing, a petitioner must establish (1) injury-in-fact, (2) traceability, and (3) redressability. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). An organization has representational standing when (1) at least one of its members would have standing in his own right, (2) the organization's purpose is germane to the interests it seeks to protect, and (3) there is no need for direct participation by the individual members in the action. *Id.* To establish injury-in-fact

in the environmental context, a petitioner "need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area are lessened" by the challenged activity. *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, 268 F.3d 255, 263 (4th Cir. 2001) (cleaned up).

The addendum to this brief includes the Declarations of Elizabeth Garst, Bonnie Law, Mary Coffey, David Sligh, Roberta Johnson, Steve Powers, Russell Chisholm, and Bill Wolf. Those declarations from Petitioners' members establish judicially cognizable harms to their aesthetic, recreational, professional, and property interests threatened by the Pipeline.

Garst can see one of MVP's proposed crossings of Teels Creek from her backyard. Garst Decl., ¶¶13-14 (AD069). Garst has reasonable concerns about that crossing's impact on Teels Creek and its aquatic life, and those concerns diminish her enjoyment of the stream. *Id.*, ¶¶16-17 (AD069-70).

Law has a lifelong connection to the Blackwater River, including the segment downstream of MVP's proposed crossing that flows into Smith Mountain Lake. Law Decl., ¶¶9-13 (AD072). Law has reasonable concerns about the effect of that proposed open-cut crossing on water quality in the Blackwater, and now foregoes recreating on the Blackwater River section of Smith Mountain Lake because of effects from Pipeline construction. *Id.*, ¶¶17-18 (AD073). Law also lives near the

Pipeline right-of-way but intends to sell her home and move away if the Pipeline is completed because of the risks of explosion. *Id.*, ¶¶24-27 (AD074).

Coffey owns two wetlands through which MVP intends to trench. Coffey Decl., ¶¶9-15 (AD077-78). Coffey "will enjoy [her] wetlands much less if the [P]ipeline is constructed through them." *Id.*, ¶22 (AD079).

Sligh has a long history with many streams MVP intends to cross, including the Craig and Bottom Creek watersheds, through which MVP intends to trench multiple times. Sligh Decl., ¶¶7-14, 19-25 (AD083-86, AD088-91). Sligh "highly value[s]" the unique aquatic environments and scenic beauty of the Bottom Creek watershed, but laments the "lasting damage" that multiple cuts in that watershed will cause. *Id.*, ¶34 (AD093-94).

Johnson will suffer a cognizable injury-in-fact from the Pipeline's stream crossings near her home on Bent Mountain. Amended Johnson Decl., ¶¶8-22 (AD099-106). Johnson has worked for nearly a decade to protect Bottom Creek—a stream designated as an Exceptional State Water bordering her property. *Id.*, ¶¶8-10 (AD099-100). Pipeline construction in the Bottom Creek watershed threatens to "extinguish entirely" her enjoyment of Bottom Creek. *Id.*, ¶12 (AD101).

Powers is a fisheries biologist and an avid kayaker, and "two of [his] very favorite places to kayak are in the path of the MVP"—Bottom Creek Gorge and the Roanoke River. Powers Decl., ¶¶5-10 (AD108). Sedimentation and increased

— 5 —

turbidity from stream crossings will injure Powers's "personal, recreational, aesthetic, and professional interests" in the affected streams. *Id.*, ¶15 (AD109).

Chisholm uses or visits Sinking Creek daily, particularly a historic covered bridge and municipal park, both of which are located within 2.5 miles of several proposed Pipeline crossings. Chisholm Decl., ¶¶9-10 (AD113-14). Knowing that Pipeline construction will affect water quality in the Sinking Creek watershed, negatively impacting the wildlife and unique natural beauty of Giles County, already lessens Chisholm's enjoyment and brings him constant worry and frustration. *Id.*, ¶¶8-13 (AD113-16).

Wolf is also already injured by the threat of Pipeline construction in the Sinking Creek watershed. Wolf Decl., ¶5 (AD119). Wolf often uses and enjoys Sinking Creek, and his constant concern about adverse effects that future Pipeline construction will have on the water quality, economy, and quality of life in Craig County impacts his current use and enjoyment. *Id.*, ¶¶5, 8-9 (AD119-21).

The above-described injuries are fairly traceable to the Certification. Without the Certification, MVP cannot trench through streams owned or used by Petitioners' members. Garst Decl., ¶¶21-22 (AD070); Law Decl., ¶¶28-29 (AD074); Coffey Decl., ¶29 (AD080); Sligh Decl., ¶¶38-39 (AD095); Amended Johnson Decl., ¶23 (AD106); Powers Decl., ¶¶18-19 (AD110); Chisholm Decl., ¶6 (AD112-13); Wolf Decl., ¶4 (AD118-19). Moreover, judicial relief would redress those injuries. Garst

Decl., ¶¶21-22 (AD070); Law Decl., ¶¶28-29 (AD074); Coffey Decl., ¶¶28-29 (AD080); Sligh Decl., ¶¶38-39 (AD095); Amended Johnson Decl., ¶23 (AD106); Powers Decl., ¶¶18-19 (AD110); Chisholm Decl., ¶17 (AD117); Wolf Decl., ¶13 (AD122); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992).

Because their members have standing, Petitioners also have organizational standing. Their members' interests in protecting Virginia's waters and land are germane to their organizational purposes. *See, e.g.*, Garst Decl., ¶5 (AD068); Coffey Decl., ¶¶4-8 (AD076-77); Amended Johnson Decl., ¶¶3-5 (AD096-97); Chisholm Decl., ¶¶3-5 (AD111-12); Wolf Decl., ¶3 (AD118). Moreover, the members' individual participation is unnecessary because this case seeks *vacatur* of agency action, not individualized relief. Accordingly, Petitioners have standing, and this Court has jurisdiction.

## STATEMENT OF ISSUES

1.    Whether issuance of the Certification was not in accordance with law because the Agencies, based on their misinterpretation of state law, refused to evaluate whether MVP's proposed waterbody-crossing locations are the LEDPA.

2.    Whether issuance of the Certification was arbitrary and capricious because the Agencies failed to evaluate whether MVP's proposed waterbody-crossing methods are the LEDPA or explain their uncritical acceptance of MVP's

preferences, especially in the face of MVP's prior inconsistent statements about less damaging crossing methods.

3.    Whether issuance of the Certification was arbitrary and capricious for failure to consider an important aspect of the problem because the Agencies claimed they could not predict MVP's future compliance with Virginia's narrative water quality standards even though the record establishes they could.

## STATEMENT OF THE CASE

### *Legal Framework*

This petition for review challenges the Certification the Agencies issued to MVP under CWA §401 for instream Pipeline construction. 15 U.S.C. §717r(d)(1) (AD007). Under §401, an applicant for a federal permit that has the potential to result in a discharge—like a CWA §404 permit from the Army Corps of Engineers (the "Corps") to trench through streams and wetlands to build a pipeline—must first obtain a certification from the affected states that water quality standards will be met. 33 U.S.C. §1341(a)(1) (AD009-10).

Virginia administers §401 for most projects through the Virginia Water Protection ("VWP") permit program, and a VWP permit "constitute[s] the certification required under [CWA §401]." Va. Code §62.1-44.15:20(D) (AD026). In 2018, the General Assembly enacted Senate Bill 950 to comprehensively enhance Virginia's §401 scrutiny of gas pipelines regulated by the Federal Energy Regulatory

Commission ("FERC") that are larger than 36 inches inside diameter. *See* 2018 Va. Acts 962-66 (AD038-42). Among other things, Senate Bill 950 codified a requirement that large pipelines like MVP's must obtain *both* a VWP permit and a separate certification covering upland construction activities, which jointly comprise the §401 certification for those pipelines. *See id.* at 965-66 (AD041-42), *codified at* Va. Code §62.1-44.15:80-84. Senate Bill 950 also made large pipelines ineligible for streamlined general permits for instream work. *See id.* at 964-65 (AD040-41), *codified at* Va. Code §62.1-44.15:21(D)(2) and §62.1-44.15:21(J). The Pipeline is subject to the upland certification requirement by dint of its 42-inch diameter, but this case is about only the VWP permit side of the equation. For clarity, Petitioners refer to the VWP permit program as Virginia's §401 program.

Two aspects of Virginia's §401 program are especially relevant here. ***First***, like the North Carolina program addressed in *Mountain Valley Pipeline, LLC v. North Carolina Department of Environmental Quality*, 990 F.3d 818 (4th Cir. 2021), Virginia's §401 program requires the Board to consider alternatives to the proposed activities to avoid and minimize impacts to the Commonwealth's waters. Virginia's §401 program incorporates a requirement from the federal *Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material* that a CWA §401 certification application must include an alternatives analysis "to first avoid and then minimize impacts to surface waters to the maximum extent

— 9 —

practicable." 9 Va. Admin. Code §25-210-80(B)(1)(g) (AD053) (citing 40 C.F.R. Part 230). Under Virginia law, "[a]voidance and minimization includes … the specific on-site and off-site measures taken to reduce the size, scope, configuration, or density of the proposed project, including review of alternative sites where required for the project, which would avoid or result in less adverse impact to surface waters." *Id.* That is the source of the requirement that the proposed action be the "least environmentally damaging practicable alternative" or "LEDPA" for both *locations* and *methods*. *Id.* It is the applicant's burden to demonstrate that its proposal is the LEDPA, *id.*, and the Board must deny a certification where "[t]he project that the applicant proposed fails to adequately avoid and minimize impacts to state waters to the maximum extent practicable," *id.* §25-210-230(A)(3) (AD062). Finally, Senate Bill 950 provided that "[e]ach wetland and stream crossing" for large pipelines "shall be considered as a single and complete project." 2018 Va. Acts 964 (AD040), *codified at* Va. Code §62.1-44.15:21(J)(1) (AD029). Consequently, the requirements imposed on the applicant and the Agencies apply on a crossing-by-crossing basis, not at the project level.[1]

---

1 At minimum, Virginia law requires individual review for crossings of waterbodies with upstream drainages of five square miles or greater. Va. Code §62.1-44.15:21(J)(1) (AD029).

*Second*, Virginia's §401 program imposes a narrative water quality standard with multiple criteria. "Water quality standards are a critical component of the CWA regulatory scheme," *Nat. Res. Def. Council v. EPA*, 16 F.3d 1395, 1399 (4th Cir. 1993), and the Environmental Protection Agency ("EPA"), which oversees state water quality standards, recognizes that they "are legally required to be met [at] all times." 49 Fed. Reg. 37,998, 38,038 (Sept. 26, 1984). Virginia's narrative water quality criteria provide, in relevant part:

> State waters, including wetlands, shall be free from substances attributable to sewage, industrial waste, or other waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life.

> Specific substances to be controlled include, but are not limited to: … *substances that produce* color, tastes, *turbidity*, odors, *or settle to form sludge deposits*[.]

9 Va. Admin. Code §25-260-20(A) (AD064) (emphasis added). Virginia's "narrative standards include a biological component that is assessed by, among other things, monitoring benthic macroinvertebrates," *S. Appalachian Mountain Stewards v. Red River Coal Co.*, 420 F.Supp.3d 481, 489 (W.D. Va. 2019), *aff'd*, 992 F.3d 306 (4th Cir. 2021), which are "nonvertebrate, aquatic organisms that are large enough to be seen with the naked eye," *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 199 n.17 (4th Cir. 2009).

### *Statement of Facts*

MVP's proposed Pipeline is a large project by any measure, snaking 304 miles of 42-inch diameter pipe through West Virginia and Virginia. *Sierra Club II*, 981 F.3d at 255. MVP claims construction is "substantially complete," (AR007926 (JA0392)), but the reality is that significant obstacles remain, including hundreds of stream and wetland crossings. In Virginia alone, the 107 miles of Pipeline route remain perforated in 236 locations by incomplete waterbody crossings. AR020155 (JA0001); AR020463 (JA0752).

In pipeline construction, there are two main ways to cross waterbodies. The developer can trench *through* the waterbody using an open-cut crossing (which requires a CWA §404 permit) or it can tunnel *under* the waterbody using a trenchless crossing (which generally does not). AR000057 (JA0173).

MVP's strategy for waterbody crossings has shifted over time. After years of failed efforts to qualify for streamlined general permits with comparatively lax oversight, the company has now belatedly pivoted to a more rigorous regulatory scheme that should have applied from the start. MVP has also seesawed between preferring open-cut and trenchless crossing methods at dozens of crossings as the company's priorities have changed.

*MVP's Original Plan*

MVP intended to use open-cut, dry-ditch methods to trench through all the waterbodies in the Pipeline's path. AR034665 (JA1967). As the name suggests, an open-cut, dry-ditch crossing requires dewatering the streambed to create a dry working area. AR000057-58 (JA0173-74). For its open-cut, dry-ditch crossings, MVP would establish dry working conditions and then excavate a trench through the streambed to bury the Pipeline under at least three feet of dirt and rock. *Id*. Some stream crossings would require instream blasting, which could "injure or kill aquatic organisms" and "temporarily increase stream turbidity." AR034560 (JA1948). After placing the Pipeline in the trench, MVP would then backfill the trench, attempt to restore the streambed, and allow normal streamflow to resume. AR000058 (JA0174).

Because open-cut, dry-ditch crossings "involve the discharge of fill material into federal waters, the CWA requires MVP to obtain approval from [the Corps] before beginning construction." *Sierra Club II*, 981 F.3d at 256. MVP initially attempted to satisfy that requirement by obtaining authorization to discharge fill material under a streamlined general permit from the Corps called Nationwide Permit ("NWP") 12, in lieu of the more-demanding process of obtaining an individual permit. *See generally Sierra Club v. U.S. Army Corps of Eng'rs* ("*Sierra Club I*"), 909 F.3d 635 (4th Cir. 2018).

*NWP 12*

MVP's plan to use NWP 12 ran into legal trouble early and often. In late 2017, the Corps first verified that MVP's stream-crossing activities were authorized by NWP 12. *Id.* at 641. But in 2018, this Court vacated the Corps' verification that MVP was eligible to use NWP 12 because construction of the Pipeline could not satisfy certain West Virginia-specific conditions on the permit, disqualifying its use route-wide. *Id.* at 655. The Court observed that "an individual permit [under §404] will likely be necessary." *Id.* Instead, MVP doubled down on NWP 12. The Corps and West Virginia attempted to change the NWP 12 conditions that rendered MVP ineligible for that permit, and in September 2020, the Corps once again issued verifications allowing MVP to construct waterbody crossings under NWP 12. *See Sierra Club II*, 981 F.3d at 254-63. However, this Court stayed MVP's reissued NWP 12 verifications on November 9, 2020. Order, *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 20-2039(L), ECF #50 (4th Cir. Nov. 9, 2020).

*"Well Suited for Conventional Bores"*

In response to the stay of its NWP 12 verifications, MVP for the first time began seriously considering more widespread use of trenchless crossing methods, which generally do not require §404 authorization. "[T]renchless methods are the least destructive approach for pipeline crossings of waterbodies absent special site-specific conditions." AR034310 (JA1840).

— 14 —

Just nine days after this Court stayed MVP's 2020 NWP 12 authorizations, MVP asked FERC for permission to use trenchless technologies to bore under every waterbody along the first 77 miles of its route. *See* AR034663-79 (JA1965-81). Specifically, MVP proposed to bore under 69 waterbodies at 41 locations, AR034663 (JA1965), using a "conventional bore" technique in which MVP would dig "bore pits" on each side of the waterbody and then bore a tunnel to install the Pipeline under the waterbody, AR034691-92 (JA1987-88). MVP recognized the technique would reduce adverse impacts on waterbodies. AR034673 (JA1975). MVP sought this change to try to complete the first 77 miles of the Pipeline and begin interim service to an interconnection with another interstate natural gas pipeline at Milepost 77.6. *Id*. MVP identified this Court's November 9, 2020 stay as the impetus for its proposal. AR034690 (JA1986).

MVP certified to FERC that "[t]he crossing lengths, bore geometry, terrain, and bore pit logistics for the crossings at issue in this [application] are well suited for conventional bores." AR034691 (JA1987). MVP also certified to FERC that bore failures at those crossings were "unlikely." AR034669 (JA1971).

On December 1, 2020—before FERC acted on MVP's November 2020 application for permission to bore under the waterbodies along the first 77 miles of the Pipeline—this Court published a per curiam opinion explaining why it stayed MVP's 2020 NWP 12 authorizations. *Sierra Club II*, 981 F.3d at 254-65.

— 15 —

*MVP's Current Plan and CWA §401 Application*

In early 2021, MVP altered its plans once more. The company decided to seek an individual CWA §404 permit from the Corps to construct open-cut crossings at the majority of its waterbody crossings, and to submit yet another request to FERC seeking permission to bore under yet another set of streams and wetlands.[2] MVP's new plan entailed asking the Corps to revoke the 2020 NWP 12 verifications and withdrawing the November 2020 FERC Application.[3]

Notably, when MVP submitted its new trenchless-crossing application to FERC on February 19, 2021, it no longer sought to bore under every waterbody along the first 77-miles of the route. Indeed, the February 2021 application only sought to implement three of the 41 trenchless crossings proposed in the November 2020 FERC Application.[4] MVP abruptly changed its position on trenchless crossing feasibility along the first 77 miles of the route, now certifying that trenchless

---

2  Letter from Todd Normane, Mountain Valley Pipeline, LLC, to U.S. Army Corps of Eng'rs, Fed. Energy Regul. Comm'n, W. Va. Dep't of Envtl. Prot., & Va. Dep't of Envtl. Quality, Re: Mountain Valley Pipeline Project at 1-3 (Jan. 26, 2021), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=020B6D24-66E2-5005-8110-C31FAFC91712.

3  *Id.*

4  *Compare* AR034712-13 (JA2008-09) *with* Mountain Valley Pipeline, *Supplemental Environmental Report for Proposed Certificate Amendment for Avoidance of Waters of the United States*, tbl. A-1 (Feb. 2021), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=020BDF05-66E2-5005-8110-C31FAFC91712.

crossings are impracticable for 38 of the 41 crossings it had previously certified to FERC were "well-suited" for conventional bores. AR006978-82 (JA0304-08).

Contemporaneously with its February 2021 applications to the Corps and FERC, MVP applied to the Agencies for a CWA §401 certification for its individual CWA §404 permit. AR000122-58 (JA0195-231). MVP's application to the Agencies incorporated the alternatives analysis in its CWA §404 application to the Corps. AR000148 (JA0221). Regarding alternative crossing locations, that application failed to provide a crossing-by-crossing examination of minor route alignment changes that would avoid water crossings entirely or minimize impacts on aquatic resources by relocating crossing locations upstream or downstream. Instead, MVP only summarized a handful of the high-level routing alternatives FERC considered in 2017 and contended that the route "certified by FERC[] should be considered the LEDPA." AR000020 (JA0273). Regarding alternative construction methods, in Table 15 of its application, MVP purported to include a crossing-by-crossing review of whether each crossing should be completed using an open-cut, dry-ditch crossing or by boring underneath the waterbody, but MVP's representations were opaque, conclusory, and unsupported. AR006978-7026 (JA0304-52).

DEQ purported to complete individual crossing reviews for all waterbody crossings, but as explained below neither DEQ nor MVP adequately analyzed

alternative crossing locations and alternative construction methods, and DEQ claimed it was unable to predict whether Pipeline construction would violate Virginia's narrative water quality criteria. Despite these failings, DEQ recommended that the Board issue the permit. AR020262 (JA0108).

On December 14, 2021, by a vote of 3 to 2, a majority of Board members present voted to issue the Certification, finding that "[t]he permit has been prepared in conformance with all applicable statutes, regulations, and agency practices" and "[t]he proposed permit addresses avoidance and minimization of surface water impacts to the maximum extent practicable." *Id.* DEQ finalized the Certification on December 20, 2021. AR020155 (JA0001).

## SUMMARY OF THE ARGUMENT

As part of their review of whether MVP's proposed waterbody crossings will comply with water quality standards, the Agencies were required to evaluate, among other things, **(1)** whether alternative crossing *locations* would be environmentally preferable and practicable, **(2)** whether less damaging crossing *methods* are feasible, and **(3)** whether MVP will fully comply with Virginia's narrative water quality criteria. On each of those issues, the Agencies' efforts fell short, rendering the Certification arbitrary, capricious, and otherwise not in accordance with law. This Court should vacate the Certification.

1.     The Agencies misconstrued Virginia law and, based on that legal error, refused to evaluate MVP's proposed crossing locations. Virginia's §401 program requires the Agencies to ask whether the discharges they are certifying "avoid and then minimize impact … to the maximum extent practicable," including by asking whether there are "alternative sites … which would avoid or result in less adverse impact to state waters." 9 Va. Admin. Code §25-210-80(B)(1)(g) (AD053).

Instead of fulfilling that obligation, the Agencies incorrectly claimed that Virginia law prohibited them from evaluating alternative waterbody-crossing locations. When they issued the Certification, the Agencies invoked Va. Code §62.1-44.15:81(F) (AD033) ("Section 81(F)"), which provides that "[n]o action by [the Agencies] on a certification request pursuant to this article shall alter the siting determination made through [FERC] or State Corporation Commission approval." AR020238 (JA0084). For the first time earlier in this litigation, the Agencies attempted to bolster their position by also relying on Va. Code §62.1-44.15:21(D)(2) (AD028) ("Section 21(D)(2)"), which provides that "[n]o Board action on an individual or general permit for such facilities shall alter the siting determination made through [FERC] or State Corporation Commission approval." Resp'ts' Opp'n to Mot. for Stay ("Virginia Stay Opp'n") at 12-14, ECF No. 33-1 (citing Va. Code §62.1-44.15:21(D)(2)). The Agencies misinterpreted both statutes, rendering the

Certification contrary to law. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law.").

There are three fatal problems with the Agencies' claims that state law prohibits them from evaluating alternative crossing locations. ***First,*** neither Section 81(F) nor Section 21(D)(2) applies in this context. Section 81(F) limits the Agencies only in connection with §401 certifications for *upland* construction activities of large pipelines. *See* Va. Code §62.1-44.15:81(F) (AD033) (applying to "a certification pursuant to this article"); 2018 Va. Acts 965 (AD041) (Article 2.6 of the State Water Control Law entitled "Additional Upland Conditions for Water Quality Certification"). Because the Certification here is for *instream*—not upland—construction, Section 81(F) has no part to play.

That leaves Section 21(D)(2), which fares no better. Although Section 21(D)(2) applies to instream construction, the Pipeline falls outside the scope of that provision due to its 42-inch diameter. Section 21(D)(2)'s restriction on altering FERC siting determinations applies only to a defined category of "such facilities," which is limited to "[f]acilities and activities of utilities and public service companies regulated by [FERC] … *except for construction of any [FERC-regulated] natural gas transmission pipeline that is greater than 36 inches inside diameter.*" Va. Code §62.1-44.15:21(D)(2) (AD028) (emphasis added). In other words, MVP's

42-inch diameter Pipeline is expressly excluded from Section 21(D)(2) because of its size.

*Second*, even if either statute applied, the Agencies misconstrue them. By their terms, both Section 81(F) and Section 21(D)(2) limit the Agencies' authority to "alter" a siting determination from FERC. Va. Code §62.1-44.15:81(F) (AD033); *id.* §62.1-44.15:21(D)(2) (AD028). But a prohibition on "alter[ing]" a siting determination does not displace the Agencies' obligation to *deny* a §401 certification for a proposal that is not the LEDPA. 9 Va. Admin. Code §25-210-230(A)(3) (AD062). Put simply, *altering* a FERC siting determination and *denying* a certification application are two different things. To "alter" means "to change or make different; modify," American Heritage Dictionary 53 (4th ed. 2000), and to "deny" means "to decline to grant or allow; refuse," *id. at* 486. So, where they apply, the statutes limit the Agencies' authority to change or modify a siting determination, such as by conditioning §401 certifications on routing realignments. But *denying* a certification because a proposed crossing location is not the LEDPA would not "alter" a siting determination at all.

If there were any question about whether prohibitions on "alter[ing]" siting determinations rescind the Agencies' obligation to deny certification of crossing locations that do not avoid and minimize impacts, it would be resolved by Va. Code §62.1-44.15:81(H) (AD033). That paragraph—which appears in the same statutory

section as Section 81(F)—makes clear that "[n]othing in this section shall be construed to prohibit [the Agencies] from taking action to deny a certification in accordance with the provisions of §401 of the federal Clean Water Act." Va. Code. §62.1-44.14:81(H) (AD033). In sum, the Agencies retained their authority and obligation to deny a certification if MVP's proposed crossing locations are not the LEDPA, so they were required to evaluate whether alternative waterbody-crossing locations would be both less environmentally damaging and practicable.

*Third,* the Agencies' contemporaneous explanation for their refusal to evaluate alternative waterbody-crossing locations relied exclusively on Section 81(F), and the Court should disregard any other justifications as impermissible post-hoc rationalizations. *See Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 84 (4th Cir. 2020) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). The Board was required to explain its reasoning when issuing the Certification, Va. Code §62.1-44.15:02(P) (AD023), and the Agencies' stated justification for refusing to evaluate alternative crossing locations—in the Final Fact Sheet and in DEQ's response-to-comments document—relied on Section 81(F) alone.

Based on arguments they made opposing a stay earlier in this litigation, the Agencies appear poised to rely on two new statutes to justify their refusal to evaluate alternative crossing locations. The Court need not reach these new rationales, but

regardless they are wrong. The first is based on Section 21(D)(2) and misconstrues the law for the reasons discussed above. The second, based on Va. Code §62.1-44.15:21(J)(2) (AD029) ("Section 21(J)(2)"), conflicts with the text and purpose of that statute.

Section 21(J)(2) mandates in part that "[a]ll pipelines shall be constructed in a manner that minimizes temporary and permanent impacts to state waters and protects water quality to the maximum extent practicable." Va. Code §62.1-44.15:21(J)(2) (AD029). Adopting an interpretation MVP proffered below, the Agencies belatedly claimed that Section 21(J)(2)'s use of the word "minimizes" with no reference to avoidance tacitly revoked the requirement that the Agencies evaluate alternative crossing locations. Not so. By its terms, Section 21(J)(2) addresses the "manner" in which pipelines are constructed, not how crossing locations are evaluated. And if Section 21(J)(2) says anything about crossing locations, it confirms they must be evaluated, because the minimization requirement alone would be sufficient to trigger that duty. *See, e.g.*, 9 Va. Admin. Code §25-210-80(B)(1)(g) (AD053) ("Avoidance *and minimization* includes, but is not limited to, … review of alternative sites where required for the project, which would avoid *or result in less adverse impact* to surface waters." (emphasis added)).

2.    The Agencies were also required to evaluate, on a crossing-by-crossing basis, whether alternative crossing *methods* would be the least environmentally

— 23 —

damaging practicable alternative. *See* 9 Va. Admin. Code §25-210-80(B)(1)(g) (AD053). MVP bore the burden to demonstrate for each proposed open-cut, dry-ditch crossing that there was no less environmentally damaging practicable alternative—like a trenchless crossing. *Id.* And the Agencies bore the burden to independently verify MVP's submissions and determine whether the company carried its burden. *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986).

But instead of holding MVP to its burden or independently verifying the company's information, the Agencies blindly accepted MVP's representations that its preferred crossing methods were the LEDPA. In doing so, the Agencies neither examined the relevant data nor articulated "a satisfactory explanation for [their] action including a rational connection between" MVP's representations and the Agencies' decision. *Friends of Buckingham*, 947 F.3d at 83.

The record was replete with red flags about MVP's crossing-method representations. The responsible DEQ staffer admitted, when asked by the Board how DEQ had examined whether MVP's preferred crossing-methods were the LEDPA, that "at some point" he had to simply "accept" MVP's crossing-method representations because he was "not particularly qualified" to assess it. AR020491-93 (JA0780-82). And reviews of MVP's crossing-method alternatives by EPA and engineering experts exposed serious flaws in the company's representations. AR019427-28 (JA0535-36); AR034310-33 (JA1840-63); AR034334-43 (JA1864-

73). Those red flags should have alerted the Agencies to deficiencies in MVP's crossing-method selection. Nonetheless, the Agencies plodded ahead without any technical analysis or independent verification of MVP's assertions.

The Agencies' blind acceptance of MVP's assertions led to a wholly inadequate explanation. Where the Agencies purported to determine that MVP's preferred crossing methods were the LEDPA, they invariably recited MVP's position, claimed to have reviewed it, and then stated their ultimate LEDPA conclusion. AR019436 (JA0544); AR020244-45 (JA0090-91); AR025781 (JA1158). But "further elaboration" is required, especially where record evidence calls the conclusion into question, as it does here. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 294 (4th Cir. 2018). Yet no such elaboration is to be found in the Agencies' explanation.

Finally, MVP's history of contradictory statements about crossing-method feasibility only amplified the need for the Agencies to independently evaluate MVP's claims in its application. *Colo. Fire Sprinkler, Inc. v. NLRB*, 891 F.3d 1031, 1041 (D.C. Cir. 2018) (vacating agency decision because of its reliance on untrustworthy information). Over the years, MVP has rejected as impracticable many trenchless crossings that it now proposes to construct, and has previously proposed trenchless crossings for locations that it now rejects. *See generally* AR034098-112 (JA1629-43). But the Agencies entirely ignored that history. "By

blinking away record evidence undermining the credibility or meaningfulness" of MVP's most recent crossing-method preferences, the Agencies "entirely failed to consider an important aspect of the problem." *Colo. Fire Sprinkler*, 891 F.3d at 1041 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

**3.**    The Agencies unlawfully refused to predict whether Pipeline construction would violate Virginia's narrative water quality criteria. Although narrative criteria may present implementation challenges, "simply ignoring … narrative criteria altogether" is "contrary to the [CWA]." *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 350 (D.C. Cir. 1993). Yet the Agencies simply "threw up their hands" and refused to engage with the issue. *Id.* Rather than make a predictive judgment about whether MVP's proposed crossings would comply with Virginia's narrative criteria, the Agencies asserted that "[t]here is no methodology to evaluate short term, subjective accounts of the narrative standard[.]" AR019406 (JA0514). Accordingly, the Agencies failed to consider an important aspect of the problem— namely, Virginia's narrative criteria. *See Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 594 (4th Cir. 2018).

Moreover, the Agencies' assertion that they lack methodologies to assess compliance with Virginia's narrative criteria runs counter to the record. Through a two-part inquiry—first examining the baseline health of the aquatic-life use at

crossing locations and then using real world data or modeling to predict the additional sedimentation and turbidity that would result from crossing construction—DEQ could have evaluated whether MVP's construction would cause violations of the narrative criteria. The record was replete with evidence of the availability of methods to assess baseline water quality, to examine compliance with the narrative criteria at completed crossings, and to model sedimentation and turbidity from future construction. AR027253 (JA1504); AR034210-15 (JA1741-46); AR034559 (JA1947). Petitioners implored DEQ to use those methodologies. AR034189-90, AR034202-03, AR034210-15 (JA1720-21, JA1733-34, JA1741-46). Yet the Agencies ignored those requests and the record evidence of the availability of such methods and instead erroneously insisted that there were no methods available to make predictions about compliance with Virginia's narrative criteria.

## **ARGUMENT**

### *Standard of Review*

In proceedings reviewing §401 certifications under NGA Section 19(d)(1), 15 U.S.C. §717r(d)(1) (AD007), this Court applies the Administrative Procedure Act's standard of review. *State Water Control Bd.*, 898 F.3d at 403 & n.13. Under that statute, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

An agency action that misapplies an applicable statute or regulation is not in accordance with law. *Sierra Club I*, 909 F.3d at 655; *accord Chenery*, 318 U.S. at 94. To survive arbitrary and capricious review in NGA Section 19(d)(1) proceedings, a state agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Friends of Buckingham*, 947 F.3d at 83 (cleaned up). A satisfactory explanation requires more than bare recitals, particularly where there is contradictory evidence in the record. *U.S. Dep't of Interior*, 899 F.3d at 294. Indeed, an agency acts arbitrarily and capriciously when it fails to "grapple with contrary evidence." *Id.* at 293 (quoting *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638-39 (D.C. Cir. 2017)). Agency actions are also arbitrary and capricious when they fail to address important aspects of the problem or run counter to the record. *U.S. Forest Serv.*, 897 F.3d at 594.

## *Discussion of the Issues*

## I.   THE AGENCIES UNLAWFULLY REFUSED TO EVALUATE ALTERNATIVE CROSSING LOCATIONS.

The Agencies were required to evaluate whether MVP's proposed crossing locations were the LEDPA and to deny certification if they were not. Virginia law commanded the Agencies to ask whether MVP's proposed crossing locations would "avoid and then minimize impacts … to the maximum extent practicable," including

by asking, on a crossing-by-crossing basis, whether "alternative sites" for MVP's proposed crossings "would avoid or result in less adverse impact to state waters." 9 Va. Admin. Code §25-210-80(B)(1)(g) (AD053). And if the answer was that alternative crossing locations would be practicable and would have fewer adverse impacts on state waters, the Agencies were obligated to deny MVP's certification. *Id.* §25-210-230(A)(3) (AD062).

The Agencies refused to even ask the question. Although the Agencies recognize their obligation to evaluate alternative crossing locations for non-pipeline projects, they concluded that Virginia law required them to give the Pipeline less scrutiny than other projects. AR020462 (JA0751). They were wrong.

## A.     The Agencies Misconstrued Virginia Law.

The Agencies claimed—incorrectly—that Virginia law prohibited them from evaluating whether alternative waterbody-crossing locations would be the LEDPA. In the decision rationale required by Va. Code §62.1-44.15:02(P) (AD023), the Agencies exclusively relied on Section 81(F), which provides that "[n]o action by [the Agencies] on a certification request pursuant to this article shall alter the siting determination made through [FERC] or State Corporation Commission approval." AR020238 (JA0084) (quoting Va. Code §62.1-44.15:81(F)). Then, when opposing a stay in this litigation, the Agencies for the first time also invoked Section 21(D)(2), which provides that "[n]o Board action on an individual or general permit for such

— 29 —

facilities shall alter the siting determination made through [FERC] or State Corporation Commission approval." *See* Virginia Stay Opp'n at 12-14 (citing Va. Code §62.1-44.15:21(D)(2)).

Even if the Agencies could rely on Section 21(D)(2) in addition to Section 81(F), the Agencies misinterpret both statutes. The cardinal rule of Virginia statutory interpretation is that courts should "ascertain and give effect to legislative intent, as expressed by the language used in the statute." *Cuccinelli v. Rector, Visitors of Univ. of Virginia*, 722 S.E.2d 626, 629 (Va. 2012) (cleaned up). If the language of a statute is unambiguous, the plain meaning of that language controls. *Id.* And if the statute is subject to more than one interpretation, courts "must apply the interpretation that will carry out the legislative intent behind the statute." *Id.* Courts may consider "the entire statute—*i.e.*, the entirety of a single legislative enactment as it appears in the Acts of Assembly as a whole—to place its terms in context to ascertain their plain meaning," because "the language of the Acts of Assembly *is* the plain language of the statute." *Eberhardt v. Fairfax County Employees' Ret. Sys. Bd. of Trustees*, 721 S.E.2d 524, 526 (Va. 2012). Finally, because "pure statutory interpretation is the prerogative of the judiciary," the Agencies' decision warrants "little deference." *Sims Wholesale Co. v. Brown-Forman Corp.*, 468 S.E.2d 905, 908 (Va. 1996).

The Agencies' interpretation of Section 81(F) and Section 21(D)(2) contravenes the legislature's language and intent and suffers from three fatal flaws.

*First*, neither Section 81(F) nor Section 21(D)(2) applies to certification of waterbody-crossing impacts from large-diameter pipelines like MVP's. ***Second,*** even if the statutes did apply, their prohibition on "alter[ing] the siting determination made through [FERC] … approval" does not deprive the Agencies of their authority *to deny* a certification when proposed crossing locations are not the LEDPA, and so does not excuse the Agencies from evaluating alternative crossing locations. ***Third***, the Agencies' reliance on statutory provisions other than Section 81(F) are post-hoc rationalizations that the Court should disregard.

### 1. Neither Section 81(F) Nor Section 21(D)(2) Applies To The Certification Of The Pipeline's Instream Construction.

The most fundamental problem with the Agencies' reliance on Section 81(F) and belated adoption of Section 21(D)(2) is that neither applies in this context. Section 81(F) concerns only so-called "upland" certifications, which are not at issue here. Section 81(F) prohibits the Agencies from "alter[ing] the siting determination made through [FERC] … approval" when they act "on a certification *pursuant to this article*." Va. Code §62.1-44.15:81(F) (AD033) (emphasis added). The "article" to which Section 81(F) refers is Article 2.6 of the State Water Control Law—titled "Additional Upland Conditions for Water Quality Certification"—which the General Assembly created in 2018 via Senate Bill 950 specifically to address the impacts of large gas pipeline construction from "activities in upland areas, outside

— 31 —

of wetlands and streams." 2018 Va. Acts 965 (AD041), *codified at* Va. Code §62.1-44.15:80. But this case is not about an upland certification under Article 2.6, so Section 81(F) simply does not apply.

Section 21(D)(2) is slightly closer to the mark, but it misses too. Although Section 21(D)(2) applies to work in streams and wetlands as opposed to uplands, the statute explicitly excludes large pipelines like MVP's from its restriction on altering FERC siting determinations. When the Agencies first invoked Section 21(D)(2) earlier in this litigation, their paraphrase of the statutory text using bracketed alterations suggested the statute applies to *all* pipeline projects. *See* Virginia Stay Opp'n at 12-14 & n.3. In reality, the limiting language in Section 21(D)(2) applies only to a specified category of "such facilities"—a category that does not include the Pipeline.

Section 21(D)(2) provides:

> The Board shall develop general permits for … [f]acilities and activities of utilities and public service companies regulated by the Federal Energy Regulatory Commission or State Corporation Commission, *except for construction of any natural gas transmission pipeline that is greater than 36 inches inside diameter* pursuant to a certificate of public convenience and necessity under § 7c of the federal Natural Gas Act (15 U.S.C. § 717f(c)). No Board action on an individual or general permit for *such facilities* shall alter the siting determination made through Federal Energy Regulatory Commission or State Corporation Commission approval.

Va. Code §62.1-44.15:21(D)(2) (AD027-28) (emphasis added). The phrase "such facilities" is the critical language because "reference has previously been made to a

category of persons or things: thus *such* means 'of that kind.'" Bryan A. Garner, *A Dictionary of Modern American Usage* 628 (1998); *see also United States v. Bowen*, 100 U.S. 508, 512 (1879) (reasoning that the "qualifying word *such* … restricted" the reference to the "class" of individuals "described in the sentence which immediately precede[d] it"); *Littlefield v. Mashpee Wampanoag Indian Tribe*, 951 F.3d 30, 37 (1st Cir. 2020) ("Normal usage in the English language would read the word 'such' as referring to the entire antecedent phrase."). The term "such facilities" in Section 21(D)(2)'s second sentence thus refers to the category specified in the first sentence, which is limited to "[f]acilities and activities of utilities and public service companies regulated by [FERC] … *except for construction of any [FERC-regulated] natural gas transmission pipeline that is greater than 36 inches inside diameter*." Va. Code § 62.1-44.15:21(D)(2) (AD028) (emphasis added). The Pipeline lies outside the scope of Section 21(D)(2) because of its 42-inch diameter.

It is no accident that Section 21(D)(2) excludes large pipelines like MVP's from its limitation on altering FERC siting determinations. When the General Assembly revised Virginia's §401 program in 2018 via Senate Bill 950, the legislature deliberately chose to place large pipelines under more scrutiny, not less. Senate Bill 950 codified the upland certification program of Article 2.6 that applies to FERC-regulated pipelines greater than 36 inches inside diameter, disqualified those same pipelines from using general permits for their in-stream work and §401

— 33 —

certifications, and removed those large-diameter pipelines from the category of "such facilities" in Section 21(D)(2). *See* 2018 Va. Acts 964-66 (AD040-42), *codified at* §62.1-44.15:80-84 (upland certifications), §62.1-44.15:21(J) (no general permits), §62.1-44.15:21(D)(2) (narrowing the definition of "such facilities"). In short, those amendments were part of the General Assembly's comprehensive effort to regulate large pipelines *more* strictly. The Agencies' misinterpretation of Section 81(F) and Section 21(D)(2) turns that legislation on its head.

### 2. Neither Section 81(F) Nor Section 21(D)(2) Abrogates The Agencies' Authority Or Obligation To Deny §401 Certification Of Pipeline Crossing Locations That Are Not The LEDPA.

Even if Section 81(F) or Section 21(D)(2) applied here, the Agencies misunderstand them. Where they apply, both statutes bar the Agencies from "alter[ing] the siting determination made through [FERC] … approval." Va. Code §62.1-44.15:81(F) (AD033); *id.* §62.1-44.15:21(D)(2) (AD028). But, by their own terms, neither Section 81(F) nor Section 21(D)(2) limits the Agencies' authority or obligation *to deny* an application under 9 Va. Admin. Code §25-210-230(A)(3) (AD062) where the proposed crossing locations are not the LEDPA. Rather, where they apply, both statutes limit only the Agencies' authority to "alter" FERC's siting determinations.

*Altering* a FERC siting determination is different from *denying* a certification application. To "alter" means "to change or make different; modify," American Heritage Dictionary 53 (4th ed. 2000), and to "deny" means "to decline to grant or allow; refuse" *id.* at 486. There is no overlap between those two terms. So where they apply, the statutes limit the Agencies' authority *to change or modify* a siting determination, such as by conditioning §401 certifications on routing realignments. In contrast, denying a certification because the proposed crossing locations are not the LEDPA would not "alter" a siting determination at all; it would simply decline to grant an application that did not meet state water quality requirements, including Virginia's avoidance and minimization requirements.

The General Assembly explicitly intended for "alter" and "deny" to mean different things in the context of pipeline permitting. Whereas Section 81(F) tells the Agencies they may not "alter the siting determination made through [FERC] … approval," a subsequent paragraph of Va. Code §62.1-44.15:81 makes clear that "[n]othing in this section shall be construed to prohibit [the Agencies] from taking action to deny a certification in accordance with the provisions of §401 of the federal Clean Water Act." Va. Code §62.1-44.15:81(H) (AD033). If there were any ambiguity, that paragraph resolves it. The General Assembly expressly did not intend the limitation on "alter[ing]" FERC siting determinations in Section 81(F) to be construed as withdrawing the Agencies' power to deny a certification. And the

corresponding limitation on "alter[ing]" FERC siting determinations in Section 21(D)(2) must carry the same meaning. *See Finnerty v. Thornton Hall, Inc.,* 593 S.E.2d 568, 571 (Va. App. 2004) ("[W]hen the legislature uses the same word or phrase 'in different parts of the same statute, the presumption is that it was used in the same sense throughout the statute, unless a contrary intention clearly appears.'" (quoting *Bridgewater Mfg. Co. v. Funkhouser*, 79 S.E. 1074, 1076 (Va. 1913))); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning.").

The plain language of the statutes and their place in the overall regulatory framework compels this reading. Pipelines like MVP's are regulated by a variety of agencies with different but overlapping purviews. Although FERC sits at the center of the regulatory scheme, other agencies must also regulate within their spheres based on their independent judgment and the laws they administer. *See, e.g.*, *Cowpasture River Pres. Ass'n v. U.S. Forest Serv.*, 911 F.3d 150, 169 (4th Cir. 2018), *rev'd on other grounds sub nom U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S.Ct. 1837 (2020). CWA §401 enshrines an independent role for States to regulate water quality impacts from federally-approved projects, 33 U.S.C. §1341(a) (AD009-10), and the NGA confirms that State authority under the CWA applies to pipelines like MVP's, notwithstanding FERC's position in the NGA's scheme of overlapping jurisdictions, 15 U.S.C. §717b(d) (AD003). Undoubtedly, "[a] state's

consideration [under §401] of a possible alternative [pipeline] route that would result in less substantial impact on its waterbodies is plainly within the state's authority," regardless of the NGA or FERC's authority. *Mountain Valley Pipeline*, 990 F.3d at 829 n.9 (quoting *Constitution Pipeline Co. v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 101 (2d Cir. 2017)).

Against that backdrop, Section 81(F) and Section 21(D)(2) recognize FERC's role in pipeline routing. Where they apply, the statutes prevent the Agencies from affirmatively reconfiguring FERC's routing determinations to avoid subjecting a pipeline developer to mutually exclusive agency commands, such as by imposing conditions on the §401 certification requiring the developer to select a different route. But because water quality impacts are squarely within the Agencies' bailiwick, the statutes preserve the Agencies' authority *to deny* a certification when water quality impacts would be unacceptable, including where a pipeline's proposed crossing locations are not the LEDPA.

Even DEQ seemed to understand the difference between "alter" and "deny" at the Board hearing on MVP's application. A DEQ official told the Board that "the energy regulatory authorities have the call on siting and alignment. And then we can't change that through *the issuance* of a Virginia Water Protection permit." AR020418 (JA0707) (emphasis added). What that statement leaves unsaid is precisely the point: The Agencies retain their authority and obligation to deny an

— 37 —

application for a project that does not avoid and minimize adverse impacts, including where alternative crossing locations would be the LEDPA. *See* 9 Va. Admin. Code §25-210-230(A)(3) (AD062) ("Basis [sic] for denial include … [t]he project that the applicant proposed fails to adequately avoid and minimize impacts to state waters to the maximum extent practicable.").

In short, even under Section 81(F) and Section 21(D)(2), the Agencies must at least ask and attempt to answer whether alternative crossing sites would be practicable and less environmentally damaging. Their categorical refusal to do so here was contrary to law.

### 3. The Agencies' Reliance On Section 21(D)(2) And Section 21(J)(2) Are Impermissible Post-Hoc Rationalizations.

The Agencies' contemporaneous explanation for their refusal to evaluate alternative waterbody-crossing locations relied exclusively on Section 81(F). The Court should disregard any justifications beyond that statute. *See Friends of Buckingham*, 947 F.3d at 84 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

The Board was required to articulate its reasoning when issuing the Certification, Va. Code §62.1-44.15:02(P) (AD023), and the only reason given for the Agencies' refusal to evaluate alternative waterbody-crossing locations was the Agencies' mistaken belief that Section 81(F) forbade the inquiry. The Final Fact

Sheet explaining the Agencies' decision to issue the Certification cites only Section 81(F) for the proposition that the Agencies could not evaluate alternative crossing locations, AR020238, AR020242 (JA0084, JA0088); the response-to-comments documents DEQ provided to the Board likewise cite only Section 81(F), AR019434-35 (JA0542-43), AR019410 (JA0518); and a DEQ official referred only to Section 81(F) when explaining to the Board why DEQ thought the Agencies could not evaluate alternative crossing locations, AR020462 (JA0751). Although the administrative record includes some stray and non-specific references to Va. Code §62.1-44.15:21 that presumably refer to Section 21(D)(2)—including an internal DEQ email, AR023754 (JA0992), and a footnote in a DEQ slide deck that cites both §62.1-44.15:21 and §62.1-44.15:81, AR025756 (JA1133)—the Agencies' contemporaneous explanation for their decision focused on Section 81(F) alone.

Earlier in this litigation, however, the Agencies adopted two brand new justifications—one based on Section 21(D)(2) and another based on Section 21(J)(2)—that are impermissible post-hoc rationalizations of counsel. The Court need not reach these or any other statutes beyond Section 81(F).

Even if those arguments were properly before the Court, they are wrong. The Agencies' belated adoption of Section 21(D)(2) fails because that statute does not apply to the Pipeline and, even if it did, would not divest the Agencies of their authority or obligation to evaluate alternative crossing locations, as discussed above.

— 39 —

The Agencies' other post-hoc rationalization also misconstrues the law. Adopting an idea MVP proffered below, the Agencies argued for the first time when opposing a stay in this case that Section 21(J)(2) implicitly revoked their authority to evaluate alternative crossing locations. Virginia Stay Opp'n at 15. The General Assembly added that provision, then designated subsection (I)(2), via Senate Bill 950 and instructed the Agencies that "[a]ll pipelines shall be constructed in a manner that minimizes temporary and permanent impacts to state waters and protects water quality to the maximum extent practicable." Va. Code §62.1-44.15:21(J)(2) (AD029). By the Agencies' reckoning, the absence of the word "avoids" in Section 21(J)(2) means they do not have to ensure that pipeline-related activities *avoid* impacts to surface water to the maximum extent practicable, but rather only have to *minimize* impacts, which they claim excuses them from evaluating alternative locations. Virginia Stay Opp'n at 15.

But the Agencies' newfound position on Section 21(J)(2) conflicts with the statute's text and purpose. Section 21(J)(2) addresses the "manner" in which pipelines are "constructed," not how alternative crossing locations are evaluated. And if it says anything about alternative crossing locations, it confirms they must be evaluated, because minimization alone encompasses reviewing whether alternative crossing locations would lessen adverse impacts. *See* 9 Va. Admin. Code §25-210-10(B) (AD047) ("'Minimization' means lessening impacts by reducing the degree

— 40 —

or magnitude of the proposed action and its implementation."); *id.* §25-210-80(B)(1)(g) (AD053) ("Avoidance *and minimization* includes, but is not limited to, … review of alternative sites where required for the project, which would avoid or *result in less adverse impact* to surface waters." (emphasis added)).

Finally, Senate Bill 950 itself belies the notion that Section 21(J)(2) tacitly revokes the Agencies' obligation to evaluate alternative crossing locations. That legislation comprehensively increased state regulation of large pipelines like MVP's, and contorting Section 21(J)(2) to do the opposite "bespeaks a deeply flawed effort to squeeze the proverbial elephant into the proverbial mousehole." *King v. Burwell*, 758 F.3d 358, 379 (4th Cir. 2014), *aff'd* 576 U.S. 473 (2015). The General Assembly would not have "alter[ed] the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *United States v. Campbell*, 22 F.4th 438, 448 (4th Cir. 2022).

## B.    The Agencies' Legal Errors Were Prejudicial.

MVP's proposed Blackwater River crossing perfectly illustrates how the Agencies' legal errors will harm water quality. The Blackwater River is an important recreational waterbody in Franklin County, Virginia, through which MVP intends to trench. AR007015 (JA0341). In their comments, Petitioners told the Agencies they must evaluate each crossing and "determine whether modest alignment changes would allow [MVP] to select a crossing location with fewer environmental impacts,"

— 41 —

and held up the Blackwater crossing as one that should be relocated. AR034144-51 (JA1675-82). And EPA objected at least twice to using an open-cut, dry-ditch crossing through the Blackwater because a trenchless method would avoid or minimize impacts. AR019428 (JA0536); AR039634 (JA2173).

Importantly, DEQ itself agrees that MVP should relocate its Blackwater crossing. AR035247 (JA2025). In response to a request for comment on FERC's draft Environmental Assessment for MVP's 2021 trenchless-crossing proposal, DEQ provided extensive comments to FERC. AR035232-314 (JA2010-92). DEQ "is responsible for coordinating Virginia's review of federal environmental documents prepared pursuant to the National Environmental Policy Act and responding to appropriate federal officials on behalf of the Commonwealth." AR035232 (JA2010). DEQ's Office of Environmental Impact Review is charged with creating "a single state response" to federal projects.[5] On September 8, 2021, the Manager of that office—on letterhead bearing then-DEQ Director David Paylor's name—sent comments to FERC that constituted "the Commonwealth of Virginia's response" to FERC's request. AR035232 (JA2010).

---

5  Virginia DEQ, *Environmental Impact Review*, https://www.deq.virginia.gov/permits-regulations/environmental-impact-review (last visited Apr. 21, 2022).

Those comments expressed DEQ's serious concerns about the Blackwater crossing. AR035247 (JA2025). Because of the Blackwater's status as a tributary of Smith Mountain Lake, and because the river is subject to a total maximum daily load for sediment under CWA §303, DEQ recommended that MVP "[r]eevaluate the location of the Blackwater River crossing and move it to a location that permits the trenchless crossing technique." *Id.* Just a few months later, however, DEQ told the Board that neither DEQ nor the Board could consider alternative crossing locations, and the Board certified the Blackwater crossing location and method to which EPA and DEQ had objected without further consideration. AR020417-18 (JA0706-07); AR020511-12 (JA0800-01).

Virginia law required examination of alternative locations for the Blackwater River and other crossings. But neither the Board nor DEQ did so, despite DEQ's own acknowledgement that relocating the Blackwater River crossing could be environmentally preferable. The Agencies' categorical refusal to evaluate alternative crossing locations and deny certification if MVP's proposed locations were not the LEDPA rendered the Certification contrary to law. *See Chenery*, 318 U.S. at 94 ("[A]n order may not stand if the agency has misconceived the law.").

## II.   THE AGENCIES' BLIND ACCEPTANCE OF MVP'S CROSSING-METHOD PREFERENCES WAS ARBITRARY AND CAPRICIOUS.

The Agencies were also required to evaluate, on a crossing-by-crossing basis, whether alternative crossing *methods* would be the LEDPA. *See* 9 Va. Admin. Code §25-210-80(B)(1)(g) (AD053). The burden was on MVP to demonstrate for each proposed open-cut crossing that there was no less environmentally damaging practicable alternative—like a trenchless crossing. *See id.* And the onus was on the Agencies to review MVP's submissions and determine whether the company carried its burden. Virginia law specifically incorporates the federal LEDPA requirement into its avoidance and minimization regime, *id.*, and federal courts have held that an agency tasked with identifying the LEDPA has "an obligation to independently verify the information supplied to it," *Hintz*, 800 F.2d at 835. In all events, reasoned decisionmaking requires an agency to "reasonably reflect upon the information contained in the record and grapple with contrary evidence." *U.S. Dep't of Interior*, 899 F.3d at 293 (quoting *Fred Meyer Stores*, 865 F.3d at 639).

But the Agencies did not hold MVP to its burden or verify the information the company supplied. Instead, they blindly accepted that MVP's preferred crossing method at any given location was the LEDPA. That was arbitrary and capricious for two related reasons. ***First***, the Agencies neither attempted to evaluate MVP's claims about crossing-method feasibility nor explained how they got from MVP's assertions to the Agencies' apparent conclusion. ***Second***, the Agencies failed to

address an important aspect of the problem: MVP's history of inconsistent, contradictory statements about whether trenchless crossing methods are practicable at dozens of crossings along the Pipeline's route.

### A.     The Agencies Neither Evaluated MVP's Claims About Crossing Methods Nor Explained Their Own Conclusions.

Rather than evaluate whether MVP's proposed crossing method was the LEDPA for any given crossing, the Agencies simply took for granted that MVP was right. They did not examine the relevant data. And because they had nothing more than their uncritical acceptance of MVP's claims, the Agencies did not explain their apparent conclusion that MVP's proposed crossing methods *were* the LEDPA. That was arbitrary and capricious. An agency must examine the relevant data and articulate a satisfactory explanation for its action. *Friends of Buckingham*, 947 F.3d at 83. Reciting a conclusion with "no further elaboration" will not do where, as here, record evidence calls the conclusion into question. *U.S. Dep't of Interior*, 899 F.3d at 293.

The Agencies did not apply any technical expertise or independent judgment to MVP's proposed crossing methods. In its application, MVP provided only a table (designated Table 15) summarizing its reasons for its preferred method at each crossing. AR027601 (JA1582). The Agencies should have evaluated whether

MVP's summary conclusions were sufficient, defensible, or even internally consistent. That is not what happened.

Instead, DEQ simply went along with MVP's preferences and recommended the Board do the same, which it did. That is not hyperbole. During the December 14, 2021 Board meeting on MVP's application, a Board member noted concerns, including those of EPA, that Table 15 was "incomplete, maybe inconsistent" and wondered aloud whether DEQ had "looked at" any "additional information other than what was contained in [Table 15]" to determine practicability. AR020487-88 (JA0776-77). He continued:

> [Y]ou all definitively state that the applicant met its LEDPA analysis based on your analysis of trenchless [*sic*] versus boring. I'm kind of curious if you can maybe open the window in terms of how you got to that conclusion[?]

AR020489 (JA0778). A senior DEQ official referred the question to the permit writer, the DEQ staffer who ostensibly evaluated MVP's proposed crossing methods. The permit writer admitted to the Board that "at some point" he had to simply "accept" MVP's crossing-method alternatives analysis because he—experienced with wetlands and waterbodies, not engineering—was "not particularly qualified" to assess it. AR020491-93 (JA0780-82). Beyond that non-answer, neither the senior DEQ official nor the permit writer, nor any other DEQ personnel, provided *any* rationale for DEQ's conclusion that MVP's proposed crossing methods were the LEDPA.

Courts allow agencies "to rely on the reasonable opinions of [their] own qualified experts," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989), but here the Agencies relied entirely on a DEQ staffer who by his own admission was not qualified to evaluate MVP's proposed crossing methods. Faced with this shortcoming, it was incumbent upon DEQ to get the input of a qualified person.

Indeed, that is precisely what transpired for other parts of MVP's application. When presented with MVP's restoration plans late in the decision-making process, the very same DEQ staffer sought input on "the technical merits of the proposed plan" and recommendations for potential reviewers from other DEQ personnel. AR023697 (JA0987). That should have happened for DEQ's review of MVP's proposed crossing methods too. But, inexplicably, it did not—despite the permit writer's own acknowledged lack of qualifications, AR020493 (JA0782), and despite there being a licensed professional engineer in DEQ's Water Permitting Division to whom the permit writer had referred other Pipeline related issues, AR023441 (JA0986); AR023409 (JA0984). By refusing to apply any scrutiny, much less expert scrutiny, to MVP's feasibility claims, the Agencies failed to examine the relevant data at all.

The Agencies were on notice of problems that warranted close evaluation, but they did not rise to the task. For example, EPA reviewed MVP's application to the Corps—including Table 15—and concluded, "[b]ased on the information available

for review, it is not clear that the proposed project represents the LEDPA." AR019427 (JA0535). EPA asked MVP for additional information explaining how trenchless methods were selected to be used or not throughout the project and that "further consideration" be given to "using [trenchless] methods at streams where not currently proposed." AR019428 (JA0536). MVP revised Table 15, but with only "minor technical corrections and cost estimates." AR027572 (JA1553).

Moreover, expert engineers who reviewed Table 15 also concluded that it did not allow for meaningful review of how MVP weighed the relevant factors to evaluate crossing-method feasibility. AR034310-33 (JA1840-63); AR034334-43 (JA1864-73). One expert engineer concluded that "the defects [in MVP's] application make it impossible to fairly assess whether [MVP's] proposal is in fact the least environmentally damaging practicable alternative." AR034310 (JA1840). The other warned that Table 15 presented "an arbitrary and capricious technology selection process." AR034338 (JA1868).

Those comments by EPA and expert engineers put the Agencies on notice that Table 15 had significant deficiencies as the sole source of information in the record underlying MVP's crossing-method determinations. But the Agencies plodded ahead without any technical analysis or independent verification of MVP's assertions. That is precisely the sort of "blind acceptance" that a court cannot condone in a LEDPA analysis, *Hintz*, 800 F.2d at 836, and it would be arbitrary and

— 48 —

capricious in any context given the red flags before the Agencies, *U.S. Dep't of Interior*, 899 F.3d at 293.

The Agencies likewise failed to provide any explanation for their conclusion that MVP's proposed crossing methods were the LEDPA. The Board was required to "provide in writing a clear and concise statement of the legal basis and justification for the decision reached." Va. Code §62.1-44.15:02(P). And in explaining its decision, an agency must be "clear enough that its path may be reasonably discerned." *Friends of Buckingham*, 947 F.3d at 84.

Yet neither DEQ nor the Board explained, in writing or otherwise, why they accepted that MVP's proposed crossing methods were the LEDPA at each crossing. Instead, they recounted MVP's representations and then leapt to their ultimate conclusion without elaboration. For example, the Final Fact Sheet explaining the Certification states that DEQ reviewed MVP's reasons for its crossing method preferences and that "[f]or the reasons discussed above DEQ has determined that the alternatives evaluated are not practicable and/or do not meet the Project's purpose and need." AR020244-45 (JA0090-91). The document responding to EPA's comments that DEQ provided the Board and DEQ's presentation to the Board are substantially similar. In each, DEQ recapped MVP's assertions and then concluded that "DEQ reviewed the crossing method analysis, including the new information, and determined that the crossing methodology as proposed in the Application is

— 49 —

consistent with DEQ's requirements for avoidance and minimization." AR019436 (JA0544) (response to comments); *see also* AR025781 (JA1158) (DEQ slide).

Although the Agencies purported to determine that MVP's preferred crossing methods were the LEDPA, AR019435 (JA0543), there is no path in the record leading from MVP's assertions to the Agencies' conclusion—much less a path that clears the hurdles presented by the critical commentary in the record. Instead, the Agencies simply described MVP's application and then tacked on a bald conclusion without the further elaboration required to address the substantial deficiencies raised by EPA and other experts. This, too, was arbitrary and capricious. *U.S. Dep't of Interior*, 899 F.3d at 293.

### B. The Agencies Failed To Address An Important Aspect Of The Problem By Ignoring MVP's Inconsistent Statements About Crossing-Method Practicability.

The Agencies' failure to evaluate MVP's statements and explain their acceptance of MVP's claims is particularly problematic because they were on notice of MVP's history of making inconsistent statements about the practicability of trenchless crossing methods at its proposed crossings. AR034098-112 (JA1629-43).

Over the years, MVP has rejected as impracticable many trenchless crossings that it now proposes to construct and has previously proposed trenchless crossings

for locations that it now rejects. The Agencies did not even acknowledge, much less grapple with, this serious red flag.

For example, MVP told FERC in 2016 that trenching under three rivers at issue in *Sierra Club I*—the Elk, Gauley, and Greenbrier Rivers—"pose[s] a risk of failure that is likely insurmountable." AR034503-05 (JA1891-93). In its current plans, however, MVP appears to have surmounted the "insurmountable" and now admits that those trenchless crossings are practicable. AR000041 (JA0157). Moreover, in November 2020, MVP told FERC that 41 of its waterbody crossings are "well suited for conventional bores[,]" AR034691 (JA1987), in an attempt to build a portion of the Pipeline when its NWP 12 strategy ran into legal trouble, AR034690 (JA1986) ("The reason for this change is a judicial stay issued by the United States Court of Appeals for the Fourth Circuit … ."). As those problems solidified, *see Sierra Club II*, 981 F.3d at 251, MVP reversed course, reporting to the Corps a mere three months later that bores are impracticable for 38 of those same crossings, AR006978-82 (JA0304-08). Stated otherwise, MVP adjusted its "practicability" determinations abruptly in response to legal obstacles, not engineering issues. MVP's almost complete reversal of its prior practicability conclusions—a change of position on 38 of 41 crossings in a three-month span without any new technical justification—at least deserved consideration by the

Agencies. Petitioners warned the Agencies, AR034105-112 (JA1636-43), but they did not even flinch.

MVP's history of contradictory statements amplified the need for the Agencies' independent review and analysis. *See, e.g.*, *Colo. Fire Sprinkler*, 891 F.3d at 1041 (vacating agency decision because of its reliance on untrustworthy information). "By blinking away record evidence undermining the credibility or meaningfulness" of MVP's word on whether trenchless crossings are feasible, the Agencies "entirely failed to consider an important aspect of the problem." *Id.* (quoting *State Farm*, 463 U.S. at 43).

## III. THE AGENCIES' TREATMENT OF VIRGINIA'S NARRATIVE WATER QUALITY CRITERIA WAS ARBITRARY AND CAPRICIOUS.

Among Virginia's water quality standards threatened by Pipeline construction are Virginia's narrative criteria, which provide:

> State waters, including wetlands, shall be free from substances attributable to sewage, industrial waste, or other waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life.

> Specific substances to be controlled include, but are not limited to: … *substances that produce … turbidity*, *… or settle to form sludge deposits*[.]

9 Va. Admin. Code §25-260-20(A) (AD064) (emphasis added). The scientific literature establishes that open-cut, dry-ditch crossings cause sediment deposits and visible turbidity plumes downstream from crossing locations and that those impacts are harmful to aquatic life. AR035754 (JA2110); AR035759-63 (JA2115-19); AR035359 (JA2100).

Such effects are manifest at MVP's completed open-cut crossing of S-G36—the North Fork of the Roanoke River—constructed on July 19, 2018. AR035849-51 (JA2127-29). MVP's inspectors reported problems with sedimentation and turbidity. *Id.* Citizen inspectors, trained by Trout Unlimited, documented sediment deposits and consistent turbidity increases downstream from the crossing location throughout the period from July 19, 2018, through September 9, 2018. AR035852-72 (JA2130-50). One citizen inspector reported to the Agencies in her October 2021 comments that sediment deposits persisted downstream of the crossing location three years later. AR039307 (JA2166). That kind of turbidity and sedimentation from pipeline crossings can cause violations of Virginia's narrative criteria by harming aquatic life. *See, e.g.* AR035361 (JA2102); AR035756 (JA2112).

Because open-cut crossings increase sedimentation and turbidity, §401 required the Agencies to evaluate whether MVP's proposed crossings would cause violations of Virginia's narrative criteria prohibiting harmful levels of such pollution. 33 U.S.C. §1341(a) (AD009-10). But the Agencies refused to do so, claiming they

lacked an available methodology. That refusal constitutes an arbitrary and capricious failure to consider an important aspect of the problem. *See U.S. Forest Serv.*, 897 F.3d at 594-96. Moreover, even assuming absence of a methodology could justify the Agencies' failure, that claimed justification runs counter to the record. *Id.*

### A. The Agencies Failed To Address An Important Aspect Of The Problem By Refusing To Predict Whether MVP's Construction Would Comply With Virginia's Narrative Criteria.

Narrative criteria like those in 9 Va. Admin. Code §25-260-20(A) are both essential and enforceable under the CWA. *Nat. Res. Def. Council*, 16 F.3d at 1405; *see also PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 716 (1994) (CWA allows "enforcement of broad, narrative criteria"). Although narrative criteria may present implementation challenges, "simply ignoring … narrative criteria altogether" is "contrary to the [CWA]." *Am. Paper Inst.*, 996 F.2d at 350.

Nonetheless, the Agencies impermissibly "threw up their hands" with regard to the narrative criteria here. *Id*. Petitioners warned the Agencies that they must evaluate the effect of open-cut crossings on Virginia's narrative water quality criteria. AR034175-81 (JA1706-12). In response, DEQ claimed that citizen reports of high turbidity could not establish water quality standard violations because Virginia lacks a numeric standard for turbidity, AR019407 (JA0515), notwithstanding that Virginia's narrative criteria expressly require turbidity "to be controlled," 9 Va.

Admin. Code §25-260-20(A) (AD064).[6] When it did acknowledge the existence of the narrative criteria, DEQ told the Board that it "utilizes a number of objective, data driven indicators to assess water quality," but in the next breath claimed "[t]here is no methodology to evaluate short term, subjective accounts of the narrative standard, such as an interference in recreational activity, as the commenters suggest." AR019406 (JA0514). The Board expressly relied on the "Board book materials"— which included DEQ's deflection about narrative criteria—in finding that MVP's open-cut crossings "will not violate applicable water quality standards." AR020262 (JA0108). In sum, the Agencies avoided effectively predicting whether MVP's stream crossings would violate Virginia's narrative criteria.

But a §401 certification's finding of compliance with water quality standards is "inherently predictive in nature." *State Water Control Bd.*, 898 F.3d at 404. Although an agency's *reasonable* predictive judgments may be entitled to deference, *Milk Industry Foundation v. Glickman*, 132 F.3d 1467, 1478 (D.C. Cir. 1998), the

---

6 DEQ has long claimed that the lack of a numeric criterion precludes it from applying the turbidity element of its narrative criteria to the Pipeline. For example, at the August 21, 2018 Board meeting about MVP's certification under NWP 12, a Board member inquired why abundant documentation of visibly turbid water flowing from Pipeline construction sites did not indicate water quality standards violations. AR000224 (JA0297). DEQ's only response was that "If we see sedimentation and turbidity in the water column, we do not have an in-stream water quality criterion for sediment. It's a — and I don't know how you would even calculate." *Id.*

agency has to actually make a predictive judgment to receive deference, *cf. Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) (courts "cannot defer to a void"). Here, the Agencies refused to do even that, inaccurately claiming they could not. Consequently, the Agencies arbitrarily and capriciously failed to consider an important aspect of the problem: Virginia's narrative criteria prohibiting harmful levels of turbidity and sedimentation. *U.S. Forest Serv.*, 897 F.3d at 594-96.

## B.  The Agencies' Claimed Lack Of Methods To Evaluate Compliance With Virginia's Narrative Criteria Runs Counter To The Record.

Contrary to DEQ's representations to the Board, materials in the record detail available methods for predicting levels of turbidity and sedimentation from MVP's project and assessing the potential for those levels to violate Virginia's narrative criteria. As commenters explained, benthic macroinvertebrate assessments can determine the baseline health of a stream in relation to the narrative water quality standards, and real-world monitoring data and predictive modelling can assess how MVP's construction has impacted (for completed crossings) or will impact (for remaining crossings) stream health.

The purpose of Virginia's narrative criteria is to prevent "interfere[nce] directly or indirectly with designated uses of [Virginia's waters]," which include a use known as the aquatic-life use. 9 Va. Admin. Code §25-260-20(A) (AD064).

DEQ's own Water Quality Assessment Guidance Manual prescribes the use of "[b]enthic macroinvertebrate surveys" such as the Virginia Stream Condition Index ("VSCI") "to determine if the waterbodies meet their designated aquatic life uses." AR027253 (JA1504). And that Guidance expressly notes that "a stream may be assessed for aquatic life use based on a single VSCI … score." AR027254 (JA1505). In fact, DEQ told the Board that "bottom-dwelling macroinvertebrates" are one of the objective indicators it uses to assess water quality. AR019406 (JA0514). This Court has recognized that such methodologies are properly used to assess compliance with narrative water quality standards. *See Ohio Valley Envtl. Coalition v. Pruitt*, 893 F.3d 225, 228 (4th Cir. 2018) (describing the West Virginia Stream Condition Index as a measure of compliance with narrative criteria); *Ohio Valley Envtl. Coalition v. Fola Coal Co.*, 845 F.3d 133, 138, 144 (4th Cir. 2017) (same); *see also S. Appalachian Mountain Stewards*, 420 F.Supp.3d at 489 (Virginia's "narrative standards include a biological component that is assessed by, among other things, monitoring benthic macroinvertebrates").

In 2017, DEQ conducted VSCI benthic assessments at six planned crossing sites along MVP's route, ostensibly to understand baseline water quality. AR035911 (JA2154); AR035913-15 (JA2156-58). Petitioners informed the Agencies that they needed similar information at every crossing location in order to make predictions about compliance with Virginia's narrative criteria. AR034202-03 (JA1733-34).

— 57 —

DEQ's water-quality-monitoring staff recommended additional similar data be collected through at least August 2021, "but leadership … said no." AR035910 (JA2153).

Nonetheless, in response to calls from EPA for biological assessments of every stream, AR019429 (JA0537), MVP provided biological assessment scores using the *West* Virginia Stream Condition Index for 22 of 159 Virginia streams on November 15, 2021. AR022686-91 (JA0910-15). But DEQ apparently did nothing with even that incomplete dataset, and just four days later told the Board that there was no methodology available to predict whether MVP will comply with Virginia's narrative criteria—almost immediately after acknowledging that "bottom-dwelling macroinvertebrates" are an available indicator. AR019380, AR019406 (JA0488, JA0514). The Agencies therefore knew of an available methodology to evaluate whether the streams in MVP's path are in compliance with the aquatic life use and the narrative criteria; they just refused to require or evaluate the necessary data to determine the current conditions at MVP's crossing locations.

Such baseline assessments would have provided one half of the information needed to predict whether MVP would comply with the narrative criteria. The second-half—how turbidity and sedimentation from MVP's crossings would affect baseline conditions—was readily obtainable via two methods: (1) review of real-

world data from MVP's completed crossings or (2) predictive modeling. The Agencies used neither.

DEQ could have evaluated, through VSCI benthic assessments, compliance with the narrative criteria at the Virginia streams through which MVP completed open-cut crossings before it lost its stream-crossing permits in 2018—like the North Fork of the Roanoke River discussed above. The Agencies were on notice of persistent sedimentation issues downstream from the North Fork of the Roanoke River crossing from public comments. AR035849-51 (JA2127-29); AR035852-72 (JA2130-50); AR039307 (JA2166). And Petitioners implored the Agencies to require benthic biological assessments at completed crossings before Certification issuance in order to determine whether those crossing activities had contributed to violations of the narrative standard and inform predictions of the effects of future crossings. AR034210-15 (JA1741-46). Nonetheless, the Agencies ignored that avenue and instead insisted they had no method to predict whether MVP's future construction would violate the narrative criteria. AR019406 (JA0514).

Additionally, future predictions of turbidity and sedimentation from MVP's open-cut crossings are possible through the use of models—as evidenced by modeling MVP performed in 2017 (at FERC's insistence) of the sedimentation effects of its proposed open-cut crossings of the Elk, Gauley, and Greenbrier Rivers in West Virginia. AR034559 (JA1947); *see also* AR034351 (JA1881) (noting the

— 59 —

absence of from MVP's application of "site-specific … modeling to predict the scale of impacts"). Petitioners suggested the use of such modeling to the Agencies, AR034189-90 (JA1720-21), yet the Agencies ignored that request.

In short, the Agencies could have examined the potential for narrative criteria violations by requiring and evaluating baseline benthic assessments combined with an examination of real-world post-construction data from completed crossings and modeled predictions of sedimentation from open-cut crossings. They did not do so. Accordingly, even if absence of a methodology could otherwise excuse the Agencies' failure to predict whether MVP's proposed crossings would comply with Virginia's narrative criteria, the claimed lack of such a methodology here arbitrarily and capriciously runs counter to the record.

## **CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that this Court vacate the Agencies' December 20, 2021 §401 Certification.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Petitioners respectfully request that this Court allow oral argument on this petition for review because it presents questions of continuing and important public interest. MVP will trench through hundreds of streams and wetlands under the Certification at issue. Moreover, given the legal and factual issues presented, the decisional process would be aided by oral argument.

DATED:      July 27, 2022

Respectfully submitted,

| | |
|---|---|
| **/s/ DEREK O. TEANEY** | **/s/ SPENCER GALL** |
| DEREK O. TEANEY | GREGORY BUPPERT |
| BENJAMIN A. LUCKETT | SPENCER GALL |
| ELIZABETH A. BOWER | CLAIRE HORAN |
| APPALACHIAN MOUNTAIN ADVOCATES | SOUTHERN ENVIRONMENTAL LAW CENTER |
| P.O. Box 507 | 120 Garrett Street, Suite 400 |
| Lewisburg, WV 24901 | Charlottesville, VA 22902 |
| Telephone: (304) 646-1182 | Telephone: (434) 977-4090 |
| Email:     dteaney@appalmad.org | Email:     sgall@selcva.org |
| *Counsel for Sierra Club; Appalachian Voices; Chesapeake Climate Action Network; Wild Virginia; Preserve Craig, Inc.; Blue Ridge Environmental Defense League; Preserve Franklin; and Natural Resources Defense Council, Inc.* | *Counsel for Preserve Bent Mountain and Preserve Giles County* |

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __21-2425__     **Caption:** Sierra Club et al. v. State Water Control Board et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains __12,972__ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☐ this brief or other document has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) /s/ DEREK O. TEANEY

Party Name__Petitioners__

Dated: __July 27, 2022__

04/12/2020 SCC

## CERTIFICATE OF SERVICE

I hereby certify that, on July 27, 2022, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

DATED:    July 27, 2022

**/s/ DEREK O. TEANEY**

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email:    dteaney@appalmad.org