No. 21-2425

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

SIERRA CLUB, ET AL.,
Petitioners,

v.

STATE WATER CONTROL BOARD, ET AL.,
Respondents,

and

MOUNTAIN VALLEY PIPELINE, LLC,
Intervenor.

## MOUNTAIN VALLEY PIPELINE, LLC'S FINAL RESPONSE BRIEF

George P. Sibley, III
J. Pierce Lamberson
gsibley@hunton.com
plamberson@hunton.com
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200

Deidre G. Duncan
dduncan@hunton.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:  (202) 955-1500

Justin W. Curtis
justin@aqualaw.com
**AQUALAW PLC**
6 South 5th Street
Richmond, Virginia 23219
Telephone:  (804) 716-9021

*Counsel for Mountain Valley Pipeline, LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-2425          **Caption:** Sierra Club, et al. v. State Water Control Board, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Mountain Valley Pipeline, LLC
(name of party/amicus)

who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2. Does party/amicus have any parent corporations?    ☑YES ☐NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   Mountain Valley Pipeline, LLC (MVP) is organized as a series limited liability company and has members. MVP's members that hold interests in the Mountain Valley Pipeline project are: MVP Holdco, LLC (MVP Holdco); US Marcellus Gas Infrastructure, LLC (USG); WGL Sustainable Energy LLC (formerly WGL Midstream, Inc.) (WGL); RGC Midstream, LLC and Con Edison Gas

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑YES ☐NO
   If yes, identify all such owners:

   Publicly held entities hold, indirectly through members of MVP, at least 10% of the interests in the Mountain Valley Pipeline project. Equitrans Midstream Corporation (NYSE: ETRN), the parent company of MVP Holdco, indirectly owns a 46.84% interest; NextEra Energy, Inc. (NYSE: NEE), the parent company of USG, indirectly owns a 31.913% interest; Consolidated Edison, Inc. (NYSE: ED), the parent company of ConEd, indirectly owns an 11.217% interest; and AltaGas Ltd. (TSX: ALA), the parent company of WGL, indirectly owns a 10.0% interest.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                                     ☑YES☐NO
    If yes, identify entity and nature of interest:

    RGC Resources Inc. (NASDAQ: RGCO), the parent company of RGC Midstream, LLC,
    indirectly owns a 1.03% interest in the Mountain Valley Pipeline project. Therefore, RGC
    Resources Inc. has an indirect financial interest in the outcome of the litigation

5.  Is party a trade association? (amici curiae do not complete this question)     ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                           ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?           ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ George P. Sibley, III                    Date: July 27, 2022

Counsel for: Mountain Valley Pipeline, LLC

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION .............................................. 4

STATEMENT OF ISSUES ....................................................... 4

STATEMENT OF THE CASE .................................................... 5

I.  Legal and regulatory background ...................................... 5

    A.  FERC's primary jurisdiction over interstate natural gas pipelines ................................................................. 5

    B.  Corps review under CWA section 404 ....................... 6

    C.  Virginia water-quality review under CWA section 401 and other State laws ................................................. 7

II.  Factual background ...................................................... 11

    A.  FERC's comprehensive analysis of alternative routes ................ 11

    B.  Initial CWA reviews ............................................. 13

    C.  Mountain Valley's comprehensive re-evaluation of stream and wetland crossings ................................... 14

STANDARD OF REVIEW ...................................................... 21

SUMMARY OF THE ARGUMENT ........................................... 23

ARGUMENT ...................................................................... 26

I.  DEQ properly declined to duplicate FERC's routing analysis ............. 26

    A.  Virginia law forbids DEQ from using permit denial to change a pipeline's route. ...................................... 26

    B.  FERC evaluated several alternative routes to cross the Blackwater ...................................................... 31

II.   DEQ comprehensively evaluated Mountain Valley's analysis of
      crossing methodologies. ........................................................ 33

III.  DEQ has repeatedly and comprehensively evaluated the Project
      for compliance with Virginia's narrative water-quality criteria. ............ 37

      CONCLUSION ........................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance to Save the Mattaponi v. Va. Dep't of Envtl. Quality*,
    621 S.E.2d 78 (Va. 2005)........................................................... 45

*Appalachian Voices v. FERC*,
    No. 17-1271, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019) ........................ 29

*Appalachian Voices v. State Water Control Bd.*,
    912 F.3d 746 (4th Cir. 2019) ...........................................*passim*

*City of Richmond v. Virginia Elec. & Power Co.*,
    787 S.E.2d 161 (Va. 2016)........................................................... 28

*In re Clean Water Act Rulemaking*,
    568 F. Supp. 3d. 1013 (N.D. Cal. 2021)....................................... 7

*Crutchfield v. County of Hanover*,
    325 F.3d 211 (4th Cir. 2003) ...........................................21, 36

*FCC v. Prometheaus Radio*,
    141 S. Ct. 1150 (2021)...........................................21, 22, 23, 45

*Friends of the Cap. Crescent Trail v. U.S. Army Corps of Eng'rs*,
    855 F. App'x 121 (4th Cir. 2021) (unpublished) ...................... 32

*Hladys v. Commonwealth*,
    366 S.E.2d 98 (Va. 1988)...........................................35, 36

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs*,
    722 F.3d 1053 (7th Cir. 2013).................................................. 32

*Jackson v. Jackson*,
    835 S.E.2d 68 (Va. 2019)........................................................... 28

*Louisiana v. Am. Rivers*,
    142 S. Ct. 1347 (2022)................................................................. 7

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ...........................................23, 32

*Nat'l Audubon Soc'y v. Dep't of Navy*,
    422 F.3d 174 (4th Cir. 2005) ................................................. 22

*Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*,
    991 F.3d 577 (4th Cir. 2021) ................................................. 22

*Natural Res. Def. Council, Inc. v. EPA*,
    16 F.3d 1395 (4th Cir. 1993) ................................................. 22

*Sanitary Bd. of City of Charleston v. Wheeler*,
    918 F.3d 324 (4th Cir. 2019) ................................................. 23

*Sierra Club, Inc. v. United States Forest Serv.*,
    897 F.3d 582 (4th Cir. 2018) ........................................*passim*

*Sierra Club v. State Water Control Bd.*,
    898 F.3d 383 (4th Cir. 2018), In 2018 ........................*passim*

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    909 F.3d 635 (4th Cir. 2018) .........................................14, 33

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    981 F.3d 251 (4th Cir. 2020) (per curiam) ...................14, 34

*Treacy v. Newdunn Assocs.*,
    344 F.3d 407 (4th Cir. 2003) ................................................... 9

*Wild Virginia v. United States Forest Serv.*,
    24 F.4th 915 (4th Cir. 2022) .........................................29, 30

**Statutes**

15 U.S.C. §717f(a) ...................................................................... 5

15 U.S.C. §717f(c) ...................................................................... 5

15 U.S.C. §717f(e) ...................................................................... 6

15 U.S.C. §717n(b) ..................................................................... 5

15 U.S.C. §717n(b)(1) ................................................................ 5

15 U.S.C. §717r(a) .................................................................... 16

iv

15 U.S.C. §717r(d)(1) ................................................................. 4

33 U.S.C. §1341(a)(1) ..........................................................7, 21

33 U.S.C. §1341(d) ..................................................................... 8

33 U.S.C. §1344 ......................................................................... 6

42 U.S.C. §4321, *et seq.* ......................................................... 5, 6

Va. Code §62.1-44.8 ................................................................... 8

Va. Code §62.1-44.14 ................................................................. 8

Va. Code §62.1-44.15 ................................................................. 8

Va. Code §62.1-44.15:21(D)(2) ...........................................*passim*

Va. Code §62.1-44.15:21(J) ....................................................... 9

Va. Code §62.1-44.15:21(J)(2) .................................................. 18

Va. Code §62.1-44.15:31 .......................................................... 10

Va. Code §62.1-44.15:51 .......................................................... 10

Va. Code §62.1-44.15:80 ......................................................26, 41

Va. Code §62.1-44.15:81(E) ..................................................... 10

Va. Code §62.1-44.15:81(F) ................................................*passim*

**Regulations**

18 C.F.R. §157.21(f)(10) ............................................................ 6

18 C.F.R. §380.9 ........................................................................ 6

18 C.F.R. §380.12 ................................................................... 5, 6

33 C.F.R. pt. 325 ....................................................................... 6

40 C.F.R. §121.2(a)(2) (2019) ................................................... 7

40 C.F.R. §121.2(a)(3) (2019) ...............................................7, 42

40 C.F.R. §121.2(a)(4) (2019)............................................................ 8

40 C.F.R. §230.10 ............................................................................ 35

9 Va. Admin. Code §25-210-80(B)(1)(g) ....................................27, 35

9 Va. Admin. Code §25-210-80(D)(1)................................................ 27

9 Va. Admin. Code §25-210-110(B) ................................................. 18

9 Va. Admin. Code §25-210-120 ...................................................... 27

9 Va. Admin. Code §25-840-40 ........................................................ 39

**Other Authorities**

2022 Va. Acts Ch. 356,
   https://tinyurl.com/bddxz8dt ................................................... 8

Appalachian Voices, Mountain Valley Pipeline,
   https://tinyurl.com/2p96uzdh.................................................. 2

Commonwealth Response to FERC MVP DEIS (Dec. 22, 2016) ................. 29

DEQ Water Quality Monitoring,
   https://tinyurl.com/2p94dbe3 ............................................... 40

FERC, Mountain Valley Project and Equitrans Expansion Project
   Final Environmental Impact Statement (June 2017) (FERC
   EIS).............................................................................12, 13, 29, 33

FERC, Order Amending Certificate (April 8, 2022) ..................................... 16

Guidance Memo No. GM17-2003, *Interstate Natural Gas
   Infrastructure Projects Procedures for Evaluating and Developing
   Additional Conditions for Section 401 Water Quality Certification* ................... 41

Sierra Club Policy Statement, Fracking for Natural Gas and Oil
   (January 22, 2015), https://tinyurl.com/mr3uecux ................................. 2

USGS Water Quality Monitoring,
   https://tinyurl.com/2p95tkpr ................................................. 40

Wild Virginia, Mountain Valley Pipeline: What Are We Doing?,
     https://tinyurl.com/mhb48fkt ................................................................... 2

## TABLE OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| Annual Standards | Annual Standards and Specifications |
| APA | Administrative Procedure Act |
| Board | Virginia State Water Control Board |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| DEQ | Virginia Department of Environmental Quality |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| FERC | The Federal Energy Regulatory Commission |
| JPA | Joint Permit Application |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| NWP12 | Nationwide Permit 12 |
| SCC | Virginia State Corporation Commission |
| USGS | United States Geological Survey |
| VSCI | Virginia Stream Condition Index |
| VWP Permit | Virginia Water Protection Permit |
| WVSCI | West Virginia Stream Condition Index |

## **INTRODUCTION**

State and federal regulators have studied the environmental effects of building the Mountain Valley Pipeline (the "Project") more comprehensively than any other major infrastructure project of its kind. Virginia regulators alone have devoted over 10,000 hours to study and monitor this Project since 2016. The Virginia Department of Environmental Quality (DEQ):

- Provided substantial input to the Federal Energy Regulatory Commission (FERC) as part of its review under the National Environmental Policy Act (NEPA), successfully advocating for an adjustment to the Project's route to protect drinking water resources;

- Comprehensively studied the Project's effects in 2017 and certified that Project construction would not violate Virginia's water-quality standards;

- Carefully monitored construction since 2018 to ensure that mandated controls are performing properly, and issued citations to Mountain Valley when it identified shortcomings;

- Conducted continuous water-quality monitoring for numerous parameters, including turbidity, in priority streams crossed by the Project since 2017 in coordination with the United States Geological Survey (USGS); and

- Solicited, received, and responded to substantial public comment in 2019 regarding the potential effects of dry open-cut stream crossings, and concluded based on that review that protections then in place sufficed.

DEQ did all of that *before* it comprehensively studied the Project for nine months in 2021 and once again verified pursuant to Clean Water Act (CWA)

1

section 401 that Project construction—subject to the rigorous conditions it has imposed—will not violate Virginia's water-quality standards. On December 20, 2021, the Virginia State Water Control Board (the "Board") certified that conclusion.

Petitioners once again challenge Virginia's certification, and that should come as no surprise. No degree of study will ever suffice for them. They want to kill the Project, because the pipeline would transport natural gas and they oppose *any* use of fossil fuels.[1] But Petitioners do not implement federal energy policy—FERC does. Nor are Petitioners arbiters of whether and how major infrastructure projects can be built in compliance with Virginia's water-quality standards—that job belongs to DEQ and the Board. And the conclusions of DEQ and the Board under review here cannot be set aside merely because Petitioners have identified reasons why they would have reached different conclusions, or because Petitioners fault FERC for failing to

---

[1] *See, e.g.*, Sierra Club Policy Statement, Fracking for Natural Gas and Oil (January 22, 2015), https://tinyurl.com/mr3uecux ("There are no 'clean' fossil fuels. The Sierra Club is committed to eliminating the use of fossil fuels, including coal, natural gas and oil, as soon as possible. We must replace all fossil fuels ...."); Appalachian Voices, Mountain Valley Pipeline, https://tinyurl.com/2p96uzdh ("Appalachian Voices has partnered with legal teams at Appalachian Mountain Advocates and Sierra Club to challenge MVP's actions in court to ... stop this ill-conceived, dangerous and unneeded project."); Wild Virginia, Mountain Valley Pipeline: What Are We Doing?, https://tinyurl.com/mhb48fkt ("[W]e and thousands of allies have prevented the pipeline's completion and continue the fight to stop it on all fronts.").

conform to their narrow policy agenda.  No, this Court can only vacate the
certification if it concludes DEQ's decision was arbitrary, capricious, or
contrary to law.  And it was anything but.

Significantly, Petitioners do not squarely challenge DEQ's core
conclusion that the numerous conditions imposed by the certification provide
reasonable assurance that the Project will not violate water-quality standards.
Instead, they dispute DEQ's application of Virginia law and say the agency
should have done more to evaluate Project alternatives.  And they second-
guess DEQ's technical conclusions that the proposed dry open-cut stream
crossings will have only minimal and temporary effects on Virginia water
quality.

The Court should deny the petition.  As the State Respondents
persuasively explain, Virginia law prohibits the State from using the threat of
denial of a water-quality certification to alter the route FERC has chosen for
an interstate natural gas pipeline.  Instead, the Natural Gas Act (NGA) allows
States to weigh in on route selection during the FERC administrative process,
and that is exactly what the Virginia agencies did here.  In addition to
participating in that process, DEQ appropriately scrutinized Mountain Valley's
selection of stream-crossing techniques.  The record amply documents the
agency's careful study of Mountain Valley's evaluation of alternative

construction methods, and the fact that Mountain Valley has modified the
chosen construction methods based on the crossing-by-crossing review
Petitioners have called for is unexceptional. And the agency's conclusion that
construction of the Project would not violate water-quality standards is
supported by years of study and monitoring and reinforced through the
imposition of numerous conditions.

## STATEMENT OF JURISDICTION

This Court has original jurisdiction to review the final actions of State
agencies issuing authorizations for interstate natural gas pipelines pursuant to
federal law. 15 U.S.C. §717r(d)(1). To the extent section 717r(d)(1) applies to
the issues Petitioners raise, *see* ECF No. 93 at 34–42, this Court has
jurisdiction.

## STATEMENT OF ISSUES

Mountain Valley adopts the State Respondents' Statement of Issues. *See*
ECF No. 93 at 3–4.

## STATEMENT OF THE CASE

### I.     Legal and regulatory background

#### A.     FERC's primary jurisdiction over interstate natural gas pipelines

The Project[2] is subject to the primary jurisdiction of FERC under the

NGA.  15 U.S.C. §717f(a).  Interstate natural gas companies may not construct

or operate pipelines without a FERC-issued "certificate of public convenience

and necessity."  *Id.* §717f(c).  In evaluating public convenience and necessity,

FERC considers a project's environmental impacts and acts as the lead agency

in complying with NEPA.[3]

A critical aspect of FERC's review is the selection of a pipeline's route, a

determination that weighs the pros and cons of scores of alternatives.  15

U.S.C. §§717f(c), 717n(b).  FERC seeks to avoid potential impacts to streams

and wetlands, but also considers safety, effects on upland environmental

resources, and the impact on federally protected lands.  18 C.F.R. §§380.12(i),

(j), (m).  The analysis is complex—because pipelines are linear, modifying the

---

[2] The Project, when complete, will consist of approximately 304 miles of new 42-inch-diameter natural gas pipeline, running from Wetzel County, West Virginia to Pittsylvania County, Virginia.  In Virginia, the pipeline will span 107 miles.  JA1.

[3] *See* 42 U.S.C. §§4321–47; 15 U.S.C. §717n(b)(1).

5

route to avoid one resource at one location will cause ripple effects that may imperil other resources at other locations. *Id.* §380.12(l)(2).

FERC relies on substantial public input to make these determinations. Its process includes opportunities for FERC staff, cooperating federal and State agencies, and the public to comment on various environmental documents. *See* 18 C.F.R. §§157.21(f)(10), 380.9. FERC will only issue a certificate if the public benefits from the project outweigh any adverse effects. 15 U.S.C. §717f(e). A final certificate, therefore, often includes terms and conditions mandating changes to the project (including route variations and modifications) or required environmental mitigation to minimize adverse environmental effects. *Id.*

### B.    Corps review under CWA section 404

Interstate natural gas pipelines will inevitably cross wetlands and waters. So they require an appropriate permit under CWA section 404. 33 U.S.C. §1344. And where, as here, the pipeline crosses rivers that are navigable-in-fact, they require authorization under section 10 of the Rivers and Harbors Act. *Id.* §403. The Corps issues both of these authorizations through either individual or general permits. *Id.* §§1344(a), 1344(e); 33 C.F.R. pt. 325.

C.    **Virginia water-quality review under CWA section 401 and other State laws**

1.  **CWA section 401**

CWA section 401 gives each State the opportunity to review applications for federal authorizations that may result in discharges to its waters and verify that such projects will not violate State water-quality requirements.  33 U.S.C. §1341(a)(1).  States have broad discretion over how they conduct reviews, or whether they even conduct them at all.  They must only "establish procedures for public notice" and conclude review within a "reasonable" time, not to exceed one year.  *Id.*

States that undertake a section-401 review seek "reasonable assurance" that the proposed activity will not violate State water-quality standards.  40 C.F.R. §121.2(a)(3) (2019).[4]  Neither section 401 nor implementing regulations define what constitutes "reasonable assurance."  In general, a State can evaluate any information it deems "relevant to water quality considerations." *Id.* §121.2(a)(2).  If the State concludes that additional conditions on a project

---

[4] A federal district court vacated the Environmental Protection Agency's (EPA) 2020 revision to its section-401 water-quality certification regulations in October 2021.  *See In re Clean Water Act Rulemaking*, 568 F. Supp. 3d. 1013 (N.D. Cal. 2021).  In April, the Supreme Court stayed that decision pending appeal. *See Louisiana v. Am. Rivers*, 142 S. Ct. 1347 (2022).  DEQ acted under the previous rule but ensured its decision satisfied the requirements of both versions.  JA697–698.

7

are necessary to provide reasonable assurance that water quality will be protected, the State may impose them. 33 U.S.C. §1341(d); 40 C.F.R. §121.2(a)(4). Conditions included in a State's certification become enforceable conditions of the federal license or permit. 33 U.S.C. §1341(d).

### 2. Virginia's statutory water-quality certification process

Under Virginia law, the Board,[5] a Governor-appointed seven-member panel, has broad authority over permitting and regulation of water quality in Virginia, including section-401 certifications. Va. Code §§62.1-44.8, 62.1-44.15. DEQ serves as the Board's staff and acts at its direction. *Id.* §62.1-44.14. Under the Virginia Code, the Board authorizes DEQ to issue section-401 water-quality certifications through the Virginia Water Protection (VWP) Permit Program. *See id.* §62.1-44.15:20(A). Whenever a project proponent seeks an "individual" section-404 permit, it must submit a "Joint Permit Application" (JPA) to both the Corps and DEQ. The Board then determines whether to authorize DEQ to issue a VWP permit for that activity. If it does, that VWP permit serves as the section-401 water-quality certification for the associated Corps-issued section-404 permit. *Id.* §62.1-44.15:20(D).

---

[5] Recent Virginia legislation devolved the Board's authority to issue permits and water-quality certifications to DEQ. 2022 Va. Acts Ch. 356, available at https://tinyurl.com/bddxz8dt. But that legislation was not retroactive, so this brief describes Virginia law in effect as of December 2021.

8

The VWP Permit Program resembles the Corps' section-404 program, but it differs in key respects, especially for pipeline projects. To begin, the VWP Permit Program focuses chiefly on wetlands, in particular those that may be beyond the CWA's jurisdiction. *Treacy v. Newdunn Assocs.*, 344 F.3d 407, 413 n.4 (4th Cir. 2003). DEQ nonetheless uses the program, which includes a handful of pipeline-specific provisions, to evaluate impacts to streams in connection with CWA section-401 certification requests. For pipelines, the agency must conduct a supplemental individual review of stream crossings where the affected stream drains an area of five square miles or greater.[6] Va. Code §62.1-44.15:21(J). But DEQ cannot alter the pipeline's route: "No Board action on an individual or general permit for [pipeline projects] shall alter the siting determination made through [FERC] or State Corporation Commission [(SCC)] approval." *Id.* §§62.1-44.15:21(D)(2) & 62.1-44.15:81(F).

### 3. Virginia's comprehensive regulation of construction-related water-quality impacts

The VWP Permit Program works in concert with numerous other DEQ-administered programs to ensure pipelines are built in a manner that protects water quality. *See Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 391–92

---

[6] This review is "supplemental" because DEQ also must review and approve protective measures for *every* crossing in accordance with the annual standards and specifications. *See infra* §I.C.3.

(4th Cir. 2018) ("*SWCB*").[7]  Virginia's Erosion Control Law and Stormwater

Management Law require certain developers to implement erosion and

sediment control measures through approved "annual standards and

specifications" ("Annual Standards").  Va. Code §§62.1-44.15:31; 62.1-

44.15:51(E).  The Annual Standards impose a series of water-quality

protections, such as best management practices and monitoring requirements,

to ensure that construction activities comply with all applicable water-quality

standards.  *SWCB,* 898 F.3d at 398.  Significantly, the Annual Standards

impose requirements for *all* construction activities, including those that may

occur within streams or wetlands.  JA1404, JA1437–1447, JA1452.  That

makes sense.  For both upland and in-stream activities, the use of proper

construction practices and careful monitoring ensure no degradation of water

quality from water flowing over construction-disturbed areas.  *See* JA367

(observing that "measures for upland areas and at crossings work as a system"

to protect water quality).

---

[7] In 2018, the Virginia legislature codified DEQ's 2017 guidance imposing heightened requirements for pipeline projects.  *See, e.g.*, Va. Code §62.1-44.15:81(E).

10

II.   **Factual background**

   A. **FERC's comprehensive analysis of alternative routes**

Mountain Valley initiated the certification process with FERC in 2014 and filed a formal application with FERC for a certificate of public convenience and necessity for the Project on October 23, 2015.  Over the next two years, FERC carefully evaluated the Project's potential environmental effects and analyzed dozens of alternatives, including alternative routes.

Selecting the Project's final route took years of study.  Mountain Valley proposed an initial route in December 2014.  To develop that initial proposal, planning engineers identified the start and end points of the pipeline and potential interim gas-delivery locations.  They then used publicly available data to identify and evaluate potentially constructible routes through a desktop process that considered topography, major crossings (highways, railroad, major rivers), public lands and recreational areas, publicly available aquatic resource data, and available existing utility data.  The result was a tentative route that appeared to be constructible and to best minimize environmental impacts.  JA117, JA145.

Once Mountain Valley developed this initial proposal, it contacted landowners and initiated field surveys along a 300-foot-wide corridor to collect more detailed topographic and environmental data to better refine the route.

11

Throughout this process, Mountain Valley continually adjusted the route to ensure constructability while avoiding and minimizing environmental impacts. Mountain Valley presented the first iteration of this route to FERC in October 2015, which compared the impacts of the proposed route to theoretical alternatives. Field surveys continued after the filing, and additional route adjustments were made as new resources were identified. JA145.

FERC proposed several reroutes in the year that followed, and Mountain Valley implemented many. FERC, Mountain Valley Project and Equitrans Expansion Project Final Environmental Impact Statement, §§3.4, 3.5 & App. I (June 2017), available at https://tinyurl.com/aewzwarf (FERC EIS). After Mountain Valley made its formal filing under section 7(c) of the NGA, the company further adjusted the route in response to comments from the public and State and federal agencies, including an adjustment of the location of the Blackwater River crossing to avoid potential impacts to a public-water-supply intake. *Id.* 3-87–3-89.

To select the final route, FERC compared potential impacts of the major route alternatives and over 25 route variations on wetlands and waterbodies, steep slopes, karst areas, forested land, landowner parcels, etc. *Id.* Tables 3.4.2-1 to 3.5.3-2, App. I. Through this process, which was informed by substantial stakeholder comments—*including comments from DEQ*—FERC (and

12

the Corps as a cooperating agency) considered the full array of impacts associated with each constructible alternative, including the effects on federal lands, the proximity of routes to residential and highly populated areas, and the effects on all environmental resources. *Id.* The final route, among other things, avoided or minimized impacts to aquatic resources while also avoiding significant adverse effects to other environmental resources. Where impacts could not be avoided, FERC concluded they would be minimized through adherence to erosion and sediment control plans and mitigation measures. *Id.* 4-115–164.

## B.    Initial CWA reviews

In 2017, Mountain Valley applied to Virginia for a section-401 certification focused on upland construction activities. DEQ issued that certification after determining that the additional conditions on upland construction in the certification, acting in concert with the conditions for *in-stream* construction imposed through the Standards and Specifications, Nationwide Permit 12 (NWP12), and DEQ's water-quality certification of NWP12, provided reasonable assurance that the Project would not violate Virginia's water-quality standards. *SWCB*, 898 F.3d at 399. This Court denied Petitioners' challenge to the certification in 2018. *Id.* at 408.

13

For work in streams and wetlands, Mountain Valley originally sought and obtained authorization from the Corps to rely on NWP12. Petitioners criticized the nationwide permitting approach. Among other reasons, they said the NWP12 process avoided a rigorous crossing-by-crossing review that might identify more opportunities to further avoid or minimize stream and wetland impacts. Pet'rs' Final Opening Br. at 36–37 & n.3, ECF No. 99, *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635 (4th Cir. 2018) ("*Sierra Club I*") (No. 18-1173(L)).

Petitioners challenged the Corps' authorizations, arguing that Mountain Valley could not comply with conditions West Virginia imposed in its blanket certification for NWP12. This Court agreed and vacated the authorizations. *Sierra Club I*, 909 F.3d at 655. West Virginia later modified the conditions in question, but this Court concluded that the Corps could not lawfully give effect to those modifications and directed Mountain Valley to pursue an individual permit. *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 255 n.1, 261–62 (4th Cir. 2020) (per curiam) ("*Sierra Club II*").

## C.     Mountain Valley's comprehensive re-evaluation of stream and wetland crossings

This Court's November 2020 decision meant Mountain Valley would lack CWA authorization to work in streams and wetlands for many months. Mountain Valley briefly explored the feasibility of completing all stream and

14

wetland crossings for the first 77 miles of the Project in a way that would avoid the need for Corps section-404 authorization. Mountain Valley withdrew its application, and FERC never acted on it.

Mountain Valley then prepared and submitted a JPA for an individual permit from the Corps and associated water-quality certifications from Virginia and West Virginia. Central to the JPA was a comprehensive re-assessment of each individual stream and wetland crossing and the practicability of executing each crossing using a trenchless method. JA172. The company and a multi-disciplinary team of consultants re-evaluated the assumptions and conclusions that informed its previous analyses. It also drew on its greater familiarity with the Project area and its successful experience using trenchless methods to complete numerous crossings between late 2018 and early 2021. JA1576–1581. This analysis benefitted from real-world cost figures for the alternative construction methods and a more refined understanding of the features at each location. JA1576–1581. Ultimately, Mountain Valley concluded it could use trenchless methods for 91 of 236 crossings in Virginia. JA487. That utilization rate (nearly 40%) for trenchless crossings exceeds by a factor of eight the trenchless-crossing rate for recent FERC-certificated natural gas pipeline projects. JA1459–1476.

Mountain Valley presented this comprehensive analysis in the JPA.[8]

JA172.  In section 5.1.1, Mountain Valley:

- summarized available crossing methods and the logistical limitations of each;

- described the site-specific factors that bear on the choice of method;

- compared the environmental effects of open cuts against those of trenchless crossings; and

- summarized how it evaluated those factors to arrive at its decision.

Tables 2 and 3 report relevant data on each proposed impact site, including the nature of the resources, the scope and type of impact, and whether any sensitive species may be present.  JA395–414.  Table 12 documents the size of potential soil piles from bore bits and other logistical constraints associated with a hypothetical trenchless crossing of each resource.  JA415–426.  Tables 13 and 14 compile information on anticipated costs for dry open-cut and trenchless crossings, respectively.  JA427–428.  Table 15 summarizes the crossing-method determination for each crossing, and Figure 4 presents, for each crossing location, a topographical map overlaying a satellite image that

---

[8] Mountain Valley separately asked FERC to amend the Project's Certificate to authorize greater use of trenchless crossings.  FERC approved that request on April 8, 2022.  FERC, Order Amending Certificate (April 8, 2022), available at https://tinyurl.com/526v478w.  Petitioners here did not seek rehearing of that order and thus cannot seek judicial review of it.  15 U.S.C. §717r(a).

shows the Project route, the limits of the right-of-way, the location of streams and wetlands, and the presence of other features that could constrain construction alternatives.[9]  JA429–478 (Table 15); JA479–485 (sample Figure 4 maps).

DEQ carefully scrutinized the JPA over nine months.  It conducted two public hearings and considered thousands of public comments.  Agency reviewers formally met with Mountain Valley approximately 10 times to discuss aspects of the JPA, including the crossing methodologies summarized in Table 15 (JA429–478).  JA525.  DEQ sent two information requests to Mountain Valley relating to Table 15, including one that asked Mountain Valley to explain an apparent error that agency reviewers had identified. JA374–378, JA370–371, JA379–380.  DEQ also reviewed public comments on the JPA, including specific comments from EPA, JA532–540, which addressed Mountain Valley's selection of crossing methods.  Mountain Valley provided DEQ with extensive supplemental information packages to address the public and EPA comments on the crossing-method analysis.  JA1553, JA1000– JA1057, JA1058–1098.

---

[9] Petitioners' contention (at 45) that Table 15 constituted the entirety of Mountain Valley's crossing method alternatives analysis ignores the explanatory narrative and supporting data that were provided in the application to support the conclusions summarized in the table.

17

DEQ went well beyond what Virginia law requires in reviewing this information.  Even though the statute only mandated full individual review of the 13 crossings of streams with drainages greater than 5 square miles, JA1007, DEQ fully reviewed all 236 proposed crossings, JA91–92.  And this is the *third* time DEQ staff have reviewed each of the Project's crossings.  Between 2017 and 2018, DEQ invested over *6,500 hours* reviewing Mountain Valley's Annual Standards and site-specific construction plans, which include protective measures for each crossing.  DEQ also conducted a supplemental four-month review of each crossing—which included a public comment process—in 2018. JA199–200, JA232–272.

DEQ also reviewed the *Stream and Wetland Mitigation Framework* (the "Mitigation Framework"), which Mountain Valley developed based on substantial input from State and federal reviewers.  *See* JA547 (describing Mitigation Framework).  The Mitigation Framework imposes robust obligations to ensure the Project's instream activities comport with the requirement to minimize impacts to state waters and do not cause violations of water-quality standards.  JA1182–1402; Va. Code §62.1-44.15:21(J)(2); 9 Va. Admin. Code §25-210-110(B).  The Mitigation Framework consists of six core elements:

18

1. <u>Baseline Assessment Requirement</u>.  Mountain Valley must thoroughly document the pre-crossing condition of planned stream and wetland crossings.  *See* JA1195–1215.  This site-specific data includes water-quality data, habitat information, vegetation characteristics, soil analyses, photographs, and topographical surveys.  Mountain Valley has already collected this data and submitted it to DEQ.  *See, e.g.*, JA1164–1166 (describing baseline data and noting its receipt by DEQ); JA910–915 (summarizing baseline data).

2. <u>Restoration Work Plan</u>.  Using the information collected as part of the Baseline Assessment, Mountain Valley must develop site-specific work plans to guide the restoration of each crossing location.  And Mountain Valley must engage environmental inspectors to actively monitor construction and restoration and direct work crews to promptly correct any deviations from the site-specific plans.  JA1264–1274.

3. <u>Performance Standards</u>.  Using data from the Baseline Assessment, DEQ imposes measurable goals to ensure a stream or wetland has been successfully restored to its preconstruction condition.  The performance standards are tailored to each stream and wetland using data from the Baseline Assessment.  JA1328–1338.

19

4. <u>Monitoring Plan</u>.  Mountain Valley must monitor each restored stream and wetland for a period of three years after construction.  For each annual monitoring period, it must collect the same comprehensive suite of site-specific data collected for the Baseline Assessment, which will be used to determine whether the performance standards are being met.  Annual monitoring reports will be submitted to both the Corps and DEQ.  JA1339–1348.

5. <u>Maintenance and Adaptive Management</u>.  If monitoring demonstrates that a restored stream or wetland is not meeting performance standards, Mountain Valley must identify the cause and propose corrective action as appropriate to DEQ and the Corps. JA1349–1360.

6. <u>Supplemental Credit Determination Methodology</u>.  Even though restoration is typically the only mitigation method prescribed for temporary construction impacts, the Mitigation Framework requires Mountain Valley to supplement its mitigation credits based on the duration of temporary impacts.  This supplemental mitigation provides additional assurance that the goal of "no net loss" will be achieved if there are delays in achieving the performance standards. JA1361–1371.

20

Ultimately, based on this work, DEQ satisfied itself that Mountain Valley had demonstrated that its proposed construction plans minimized impacts to aquatic resources to the maximum extent practicable. JA91.

## STANDARD OF REVIEW

State agencies exercise broad discretion when certifying activities under Section 401. *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 754 (4th Cir. 2019) (citing 33 U.S.C. §1341(a)(1)). This Court reviews certifications under the highly deferential "arbitrary and capricious" standard, *id.* at 753, which forbids a court from "substitut[ing] its own policy judgment for that of the agency," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).[10] That deference is particularly appropriate "with environmental statutes … [where] the regulatory framework is exceedingly complex and requires sophisticated evaluation of complicated data." *Crutchfield v. County of Hanover*, 325 F.3d 211, 218 (4th Cir. 2003) (internal quotation marks omitted).

---

[10] The State Respondents correctly note that the State action here should be reviewed under Virginia law, because State actors are not subject to the Administrative Procedure Act (APA). But as Mountain Valley and this Court have recognized previously, *see SWCB*, 898 F.3d at 403 n.13, the Virginia standard of review does not differ in material respect from the familiar federal APA standard, which Mountain Valley summarizes here.

Indeed, the Court is at its most deferential when agency action involves "complex predictions within the [agency]'s area of special expertise." *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021). Accordingly, the Court does not "sit as a scientific body" in such cases, "meticulously reviewing all data under a laboratory microscope." *Id.* (quoting *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993)). Nor may courts "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 186 (4th Cir. 2005). Instead, the Court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio*, 141 S. Ct. at 1158.

Applying this standard, a court may set aside agency action as arbitrary or capricious only where the agency:

1. "has relied on factors which [the Legislature] had not intended it to consider";

2. "*entirely* failed to consider an important aspect of the problem";

3. "offered an explanation for its decision that runs counter to the evidence before [it]"; or

4. "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

22

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)

(emphasis added).  Conversely, an agency's action should *not* be set aside

because the agency might have "explore[d] a subject more deeply … [or]

discuss[ed] it more thoroughly."  *Sierra Club, Inc. v. United States Forest Serv.*,

897 F.3d 582, 597 (4th Cir. 2018).[11]  Nor should an agency's decision be set

aside if it is of "less than ideal clarity," so long as "the agency's path may

reasonably be discerned."  *Sanitary Bd. of City of Charleston v. Wheeler*, 918 F.3d

324, 333 (4th Cir. 2019) (citation omitted).

## SUMMARY OF THE ARGUMENT

1.    Virginia law blocks DEQ from altering the siting determination of

a FERC-certificated pipeline.  As the State Respondents explain, basic rules of

statutory interpretation counsel that result.  And that is no accident.  Not only

would Petitioners' contrary interpretation of Virginia Code sections 62.1-

44.15:21(D)(2) and 62.1-44.15:81(F) inappropriately render those provisions

meaningless, it would upset the delicate balance FERC must strike between

myriad factors across the entirety of the multi-state pipeline route.  Consistent

with the State Respondents' interpretation, the proper time for Virginia to

---

[11] *See also Prometheus Radio*, 141 S. Ct. at 1160 ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies.").

weigh in with the kind of analysis Petitioners say DEQ should have performed here occurs during FERC's extensive route-selection process. DEQ participated in that process for the Project, including by successfully proposing changes that mitigate impacts to the very resource—the Blackwater River—that Petitioners speculate DEQ's interpretation prejudices.

The Court should reject Petitioners' misguided interpretation of Virginia law.

2.     Petitioners have advocated the greater use of trenchless stream-crossing methods for years. But now that Mountain Valley has proposed using such methods for a large portion of the Project, they say—without identifying any specific problems—that Mountain Valley lacks credibility and that DEQ did not do enough to evaluate Mountain Valley's work. The full record tells a different story.

In preparing the JPA, Mountain Valley undertook a site-by-site reassessment of its crossing methods at each of 432 stream-crossing locations for the entire Project. Based on this extensive study, which incorporated lessons from past experience in the field, the company concluded that it could increase its use of trenchless methods to almost forty percent of the remaining crossings in Virginia—a rate far exceeding that for other recent FERC-certificated natural gas pipeline projects. DEQ carefully reviewed Mountain

24

Valley's submission, requested additional information, sought clarification, and met with the company on several occasions. These actions go well beyond what Virginia law requires and were not arbitrary or capricious.

3.    For well over half a decade, Virginia has studied the Project's effects on water quality, including its effects on the narrative water-quality criteria. Time and again, it has concluded that tried-and-true construction methods combined with an extensive monitoring regime provide reasonable assurance that the Project will not violate the narrative criteria. This Court endorsed the State's approach in 2018. *SWCB*, 898 F.3d at 404. Since then, thousands of hours of additional study and an "oversight process [that] has been more rigorous than [for] any other pipeline in Virginia history," JA906, have only confirmed the State's justifiable reliance on these controls. But DEQ did not stop there for this certification. It took the additional step of conditioning its reasonable assurance on Mountain Valley's compliance with the enhanced monitoring and mitigation requirements embodied in the Mitigation Framework.

Despite all of this, Petitioners—relying on a single sentence in DEQ's response to comments—argue that the agency should have done more. But "that is not the applicable legal standard this Court utilizes when reviewing a state agency's issuance of a Section 401 Certification." *Appalachian Voices*, 912

25

F.3d at 759. And the Court should refuse Petitioners' invitation to "second-guess" Virginia's reliance on time-tested regulatory tools under the proper standard. *Id.*; *SWCB*, 898 F.3d at 407. In any event, DEQ fully addressed the turbidity issues that Petitioners cite, and the additional assessment methods that Petitioners propose are flawed and unworkable.

## ARGUMENT

### I.    DEQ properly declined to duplicate FERC's routing analysis.

#### A.    Virginia law forbids DEQ from using permit denial to change a pipeline's route.

Two Virginia statutes forbid DEQ from altering the siting determination for a FERC-certificated pipeline. *See* Va. Code §§62.1-44.15:21(D)(2); 62.1-44.15:81(F).[12] But Petitioners say the agency nonetheless was required to reanalyze alternative routes and deny the certification request if it identified a route it liked better than the one FERC selected after years of analysis. The State Respondents explain (at 42–55) why Petitioners' reading of these key

---

[12] Section 21(D)(2) is part of the VWP program, which governs work in streams and wetlands. Section 81(F) was added in 2018 in legislation mandating that DEQ evaluate potential sedimentation effects from upland construction of large natural gas pipelines. Importantly, the VWP permit and the certification of upland construction "*together* constitute the certification required under § 401 of the Clean Water Act." Va. Code §62.1-44.15:80 (emphasis added).

provisions flouts bedrock rules of statutory interpretation, and Mountain Valley adopts those points.

Particularly flawed is Petitioners' contention (at 34–38) that sections 21(D)(2) and 81(F) only forbid DEQ from imposing conditions that would shift a pipeline's route and leave untouched the agency's ability to deny a certification request if it thinks a different route is the least environmentally damaging practicable alternative (LEDPA). Virginia law *never* allows DEQ to change *any* activity's location through permit conditions. In other words, the *only* mechanism for effecting a change in a project's route is the threat of denying the permit application. So under Petitioners' reading, sections 21(D)(2) and 81(F) do nothing at all.

Consider how that process works for *non-pipeline* projects. VWP regulations require a permit applicant to demonstrate in its application that the site for its project is the LEDPA. 9 Va. Admin. Code §25-210-80(B)(1)(g). If DEQ is not satisfied with that demonstration, it puts the applicant to a choice—revise the application or have it denied. *Id.* §25-210-80(D)(1). *That* is the *only* action DEQ can take to alter a non-pipeline activity's location when it concludes a different location—an "off-site alternative"—would be better. DEQ never even reaches the step of drafting a permit and adding permit conditions. *Id.* §25-210-120.

27

Thus, for pipeline projects, sections 21(D)(2) and 81(F) must go beyond this typical process and forbid DEQ from evaluating "off-site alternatives" in VWP permit applications for FERC or SCC-sited projects. If, as Petitioners contend, sections 21(D)(2) and 81(F) leave DEQ free to deny a VWP permit application because FERC chose a route DEQ thinks inferior, those provisions have no meaning at all. *Cf. City of Richmond v. Virginia Elec. & Power Co.*, 787 S.E.2d 161, 164 (Va. 2016) ("Every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary.").

Petitioners' reading would also frustrate the clear, common-sense purpose of these statutory provisions. *Jackson v. Jackson*, 835 S.E.2d 68, 71 (Va. 2019) (observing that courts must "interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal"). By preventing DEQ from taking any "action" (e.g., denying a permit application) to alter a siting determination, sections 21(D)(2) and 81(F) prevent avoidable conflict between DEQ and FERC on a question that DEQ is ill-equipped to resolve on its own.

Selecting the final route for an interstate natural gas pipeline is the culmination of years of study and coordination between FERC, the developer, federal agencies, States, and other stakeholders. *See supra* Statement of the

28

Case §II.A.  For this Project, agencies considered the full array of expected impacts across the entire pipeline route, not just those associated with waterbodies in Virginia.  DEQ participated in that process to ensure FERC considered potential effects on Virginia waters.[13]  And FERC did so—the final route balances effects on Virginia resources among other competing factors for the entire line to minimize impacts to environmental resources, including aquatic resources, for the Project as a whole.  FERC EIS, Tables 3.4.2-1 to 3.5.3-2, App. I, available at https://tinyurl.com/aewzwarf.

FERC's siting determination has withstood multiple direct and collateral attacks over the past four years.  The D.C. Circuit affirmed FERC's evaluation of the project alternatives in 2019.  *See Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019).  And this Court has twice rejected Petitioners' complaints about the alternatives analyses undertaken by the Forest Service and Bureau of Land Management (BLM) for the pipeline's crossing of the Jefferson National Forest.  *See Wild Virginia v. United States Forest Serv.*, 24 F.4th 915, 930 (4th Cir. 2022); *Sierra Club, Inc.*, 897 F.3d at 599–600.

---

[13] *See, e.g.*, Commonwealth Response to FERC MVP DEIS (Dec. 22, 2016), available at https://tinyurl.com/ycktn7ms; *see also, e.g.*, JA695, JA542.

Significantly, this Court quite sensibly recognized that impacts within a small portion of the route—viewed in isolation—should not dictate changes to the broader route. For example, in affirming BLM's endorsement of the route with respect to federal lands, this Court correctly observed that "the environmental impacts [under alternative routes] would simply be shifted to other lands and the increased length of the Pipeline's route would affect more acreage, incorporate additional privately owned parcels, and increase the number of residences in close proximity to the Pipeline." *Wild Virginia*, 24 F.4th at 930. For that reason, the NGA empowers only one agency—FERC— to balance these substantial competing considerations to select the Project's route. *Sierra Club, Inc.*, 897 F.3d at 600.

Virginia law logically seeks to prevent DEQ from upsetting the careful balance FERC must strike in siting the pipeline based on a narrow focus on the small portion of a pipeline right-of-way that falls within its jurisdiction. Petitioners' nonsensical reading of that law would force DEQ to belatedly block a comprehensive siting determination—even after having participated in developing that determination earlier in the process—because it thinks "alternative crossing sites would be practicable and less environmentally damaging" (Pet'rs' Br. at 38) for a *single* environmental resource along a *subsection* of the Project's broader route. All that, even though section 401

30

tasks Virginia only with developing reasonable assurance that Mountain

Valley's construction activities in the state will not violate water-quality

standards, "not … approving the project as a whole." *Sierra Club, Inc.*, 897

F.3d at 600.[14]

### B. FERC evaluated several alternative routes to cross the Blackwater.

Petitioners have not shown that a DEQ routing analysis would have

changed the result. They do not present a single concrete routing alternative

that balances all of the considerations relevant to a pipeline siting

determination. Petitioners merely speculate that DEQ might have picked a

route that would have moved the crossing of the Blackwater River. But that

speculation collapses under the weight of the record evidence demonstrating

FERC's careful evaluation of alternative locations for the Blackwater crossing.

To begin, in a challenge to the sufficiency of a LEDPA analysis under

Corps regulations—what Petitioners say DEQ should have undertaken here—

the challenger must clearly outline the viable alternative the agency should

---

[14] Even if Virginia law did compel DEQ to evaluate the Project's route as Petitioners claim, the State would be entitled to rely on the comprehensive, court-affirmed analyses of FERC, the Forest Service, and BLM. *Appalachian Voices*, 912 F.3d at 754. That is especially true for FERC's routing determination, on which DEQ provided substantial input. And the stream impacts will occur only after the Corps has completed its own evaluation of alternatives, including alternative routes. DEQ could reasonably rely on that analysis, too. *Id.* at 758 (endorsing reliance on "prospective" conditions).

have concluded was the LEDPA. *Friends of the Cap. Crescent Trail v. U.S. Army Corps of Eng'rs*, 855 F. App'x 121, 127 (4th Cir. 2021) (unpublished). That is especially so where separate agencies with siting authority have thoroughly vetted alternatives through the NEPA process. *Id.* at 126–27. The agency bears no obligation to "reinvent the wheel" by "proposing or demanding novel alternatives that no party has yet clearly outlined." *Id.* at 126 (citing *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013)). Petitioners have not satisfied this burden.

And Petitioners' speculation that DEQ would have rejected the location of the Blackwater crossing is paper thin. Petitioners (at 42) misleadingly assert that "DEQ itself agrees that MVP should relocate its Blackwater crossing." Not so. After DEQ had reviewed the JPA and developed a draft permit, a single staff member, without reviewing or considering the JPA, submitted comments on a separate FERC authorization that suggested FERC consider an alternative location for that crossing. That single statement does not reflect the informed view of the entire agency. *Nat'l Ass'n of Home Builders*, 551 U.S. at 658–59.

In fact, FERC's selection of the location for the Blackwater crossing exemplifies how the process is supposed to work. Mountain Valley originally proposed to cross the Blackwater twice, and upstream of the Town of Rocky

Mount's water supply intake. In comments to FERC submitted *before FERC made its final routing decision*, DEQ suggested crossing the Blackwater only once and downstream of the Rocky Mount intake. JA916–JA967. FERC ultimately approved a route that did so and explained the pros and cons of other alternatives. FERC EIS at 3-87–3-89, available at

https://tinyurl.com/aewzwarf. Petitioners do not explain how DEQ would have resolved the question differently.

## II. DEQ comprehensively evaluated Mountain Valley's analysis of crossing methodologies.

For years, Petitioners urged Mountain Valley to evaluate the greater use of trenchless methods for crossing streams.[15] Now that Mountain Valley has done so, and has concluded it can use the trenchless methods Petitioners prefer for nearly 40% of the remaining crossings in Virginia, they say (at 44–45)— without irony—that Mountain Valley lacks credibility and that DEQ did not do enough to evaluate Mountain Valley's work. Petitioners' critique, based on cherry-picked statements divorced of context, grossly mischaracterizes DEQ's substantial work to evaluate the JPA. And tellingly, Petitioners identify no proposed open cut that should be completed using trenchless methods.

---

[15] *See, e.g.*, Pet'rs' Final Opening Br. at 36–37 & n.3, ECF No. 99, Pet'rs' Final Reply Br. at 22–24 & n.5, ECF No. 100, *Sierra Club I*, 909 F.3d 635 (No. 18-1173(L)).

In preparing the JPA, Mountain Valley comprehensively reassessed its approach to executing stream crossings. *Supra* Statement of the Case §II.C. Instead of examining crossing techniques in gross, the company went site by site through each of 432 locations. And it did so with the benefit of experience in the field using trenchless techniques, which demonstrated the company's earlier pessimism about boring was at least partially misplaced. JA1576–1581. Of course this new approach yielded different results.

Petitioners claim that Mountain Valley's conclusions lack credibility, because Mountain Valley briefly explored the possibility of completing the first 77 miles of the Project without any jurisdictional impact after this Court's decision in *Sierra Club II*. Petitioners say this shows that Mountain Valley has taken inconsistent positions on the practicability of using trenchless methods. But that criticism assumes that Mountain Valley compared the practicability of trenchless crossings versus the practicability of dry open-cuts. After this Court's decision in *Sierra Club II*, any construction involving jurisdictional impacts, such as dry open-cut stream crossings, were not an option. So Mountain Valley only evaluated trenchless methods,[16] and thus had no reason

---

[16] *See, e.g.*, JA1986–1987 (explaining that "Mountain Valley considered the possibility of using trenchless crossing methods other [than] conventional bore for the wetlands and waterbodies between MPs 0 and 77 … [but] concluded that the use of other trenchless methods is not warranted" due to conventional bore's suitability).

34

to apply the Corps' avoidance and minimization requirements at 40 C.F.R. §230.10 that provided the framework for the analysis presented in the JPA. Petitioners (at 51 (citing JA1986–1987)) gloss over this important distinction to wrongly suggest Mountain Valley's statements about the *suitability* of conventional bores compared to other trenchless methods reflects a judgment about the *practicability* of bores compared to dry open cuts under the Corps' regulations.

In all events, DEQ comprehensively evaluated Mountain Valley's submission. "In addition to the GIS-based crossing-by-crossing analysis performed for the FERC DEIS, DEQ also conducted a crossing-by-crossing review of each plan and profile drawing included in the [JPA]." JA89. Based on this review, which exceeds what the statute mandates, DEQ "determined the JPA meets the requirement of 9 VAC 25-210-80(B)(1)(g). in providing an alternatives analysis for the proposed Project detailing the specific on-site and off-site measures taken during project design and development to first avoid and then minimize impacts to surface waters to the maximum extent practicable." JA91.

These conclusions are entitled to the presumption of regularity. *Hladys v. Commonwealth*, 366 S.E.2d 98, 100 (Va. 1988) (official actions of public

35

officials are "entitled to a presumption of honesty and fairness").  Petitioners

have not made any of the showings necessary to disturb that presumption.  *Id.*

Nor could they.  DEQ studied Mountain Valley's submission carefully,

going so far as to seek explanation for an apparent error.  JA374–378, JA370–

371, JA379–380.  DEQ made multiple information requests, to which

Mountain Valley comprehensively responded.  JA1552–1597, JA1000–1057,

JA1058–1098.  And agency reviewers participated in multiple meetings to

better understand Mountain Valley's analysis.  JA525.

Petitioners (at 46) seize on the remark by one reviewer that "at some

point" the agency must rely on the information an applicant submits.  But the

idea that the agency can rely on information submitted by an applicant is

unexceptional.  *See, e.g.*, *Crutchfield*, 325 F.3d at 223–24 (rejecting district court

conclusion that Corps had an obligation to conduct independent studies rather

than rely on extensive studies provided by an applicant).  No Virginia statute

or regulation precludes such reliance, and applicants must certify that the

information submitted in a JPA is "true, accurate, and complete."  JA299.

And the full comments by all DEQ reviewers show that DEQ did not blindly

accept Mountain Valley's submissions as Petitioners suggest.  *See, e.g.*, JA751–

753 (describing evaluation of crossing methodologies); JA757 (noting that,

based on their review, the agency "found some areas to further minimize

36

impacts to streams and wetlands"); JA780–782 (describing evaluation of

Blackwater crossing).

### III. DEQ has repeatedly and comprehensively evaluated the Project for compliance with Virginia's narrative water-quality criteria.

Premised entirely on a single sentence in DEQ's response to comments,

Petitioners manufacture an argument (at 52–60) that the Virginia agencies

"refused" to evaluate and predict whether the Project would violate narrative

water-quality standards.  Nothing could be further from the truth.

DEQ began with a simple premise backed by decades of experience:

when the agency's tried-and-true regulatory tools are applied to a large

construction project, narrative water-quality standards violations will be

avoided.  *See SWCB*, 898 F.3d at 404.  DEQ then invested years and thousands

of hours studying, monitoring, and evaluating the Project—and, as

appropriate, refining its tools—to validate that premise.  DEQ justifiably relied

on that prior work—which this Court ratified in *SWCB*—along with the

increased monitoring and mitigation requirements stipulated in the Mitigation

Framework to certify its reasonable assurance that the Project "will not violate

applicable water quality standards."  JA1.

Glossing over this substantial work, Petitioners say DEQ and the Board

should have done more.  But that does not render their decision arbitrary or

capricious.  *Sierra Club, Inc.*, 897 F.3d at 597.  Indeed, this Court has twice

37

cautioned—in the context of Virginia Section 401 certifications no less—that "no purpose … would [be] serve[d] by stepping in and second-guessing the analytical methods" chosen by the agency "to provide it with reasonable assurance that its water quality would be protected." *SWCB*, 898 F.3d at 407; *Appalachian Voices*, 912 F.3d at 759. The Court should decline Petitioners invitation to do so here.

For over half a decade, DEQ has studied the Project's effects on water quality—including its compliance with the narrative criteria. In 2017, DEQ conducted an exhaustive review of the Project's water-quality effects that examined five interconnected actions, including Corps regulation of waterbody crossings and DEQ's certification of those crossings. JA1125–1126, JA694–696. That review concluded that the conditions in Virginia's water-quality certification for upland activities "along with the requirements imposed by the VWP regulations, the Corps Section 404 permitting requirements, …. the June 2017 Annual Standards and Specifications, and the … 2017 Section 401 Water Quality Certification of the Corps Nationwide Permit 12" provided "reasonable assurance that the water quality standards will not be violated." JA893; *see also SWCB*, 898 F.3d at 399. This Court found no fault with that conclusion. *SWCB*, 898 F.3d at 390, 397–99, 404–05, 407–08.

Since the 2017 upland certification, DEQ has continued to study the Project's effects on water quality. Indeed, "the oversight process for MVP has been more rigorous than [for] any other pipeline in Virginia history." JA906. In 2017 and 2018, DEQ invested 6,500 hours in reviewing and approving erosion and sedimentation control and stormwater management covering every foot of the Project. JA909, JA849. Because Virginia's erosion and sediment control regulations apply equally to upland and instream construction activities, DEQ conducted an analysis of "[e]ach stream crossing" during that exhaustive review of the Project's plans. JA367–369 (citing the "ESC Minimum Standards" in 9 Va. Admin. Code §25-840-40). On top of that, DEQ has reviewed and approved the robust water-quality protections in the Project's Annual Standards—with improvements to take advantage of lessons learned—every year since 2017. *See* JA1404 (noting annual revisions). In 2018, the Board asked DEQ to validate various aspects of its Annual Standards and associated plans. DEQ did so. JA849–850. And later that year, at the Board's request, DEQ held a public comment period on the conditions in its NWP12 verification for the Project. *See* JA233–251. After reviewing thousands of comments, DEQ concluded that "[n]o new, crossing-

39

specific information supports the conclusion that NWP12 is not protective of any specific wetland and/or stream."[17]  JA251.

DEQ has also maintained continuous oversight of the Project since 2017.  *See* JA851.  In addition to the actions described above, the agency and a dedicated team of third-party inspectors perform near-daily inspections of the Project.  *See* JA515–516.  In coordination with USGS, DEQ also conducts continuous water-quality monitoring.  *See* JA515–516, JA524 (citing public access to water-quality monitoring at https://tinyurl.com/2p94dbe3 and https://tinyurl.com/2p95tkpr), JA696.  The agency responds to *all* third party and citizen complaints about the Project and provides a standing report on the Project to the Board on a quarterly basis.  JA516; JA695–696.

DEQ justifiably relied on this extensive prior and ongoing experience to certify its reasonable assurance that Mountain Valley will not violate the narrative criteria here.  JA524 (stating that it "relied, in part, on its own review and approval of the Project's upland *and* instream construction activities, which was embodied in the Annual Standards and Specifications approved by

---

[17] That conclusion remains relevant to this appeal because the Corps' Section-404 program and the VWP program have "substantially identical permitting requirements." JA365; *see also* JA1140–1142 (noting that the VWP permit program is *more protective* than the Section-404 program in several respects).

40

DEQ in June 2017").  That is especially true because the VWP and upland

certifications "*together* constitute the certification required under § 401 of the

Clean Water Act."  Va. Code §62.1-44.15:80 (emphasis added); Guidance

Memo No. GM17-2003, *Interstate Natural Gas Infrastructure Projects Procedures for*

*Evaluating and Developing Additional Conditions for Section 401 Water Quality*

*Certification* (DEQ guidance document in effect prior to 2018 amendments to

Virginia Code).  DEQ knows that a combination of enhanced engineering

controls, monitoring, and certification conditions will protect water quality

because those same measures have proven effective for the last five years.

Because the material facts have not shifted since past reviews, and Mountain

Valley's individual permit application *reduces* open-cut impacts to waterbodies,

JA764, DEQ's prior work alone supports its reasonable assurance that the

Project will not degrade water quality.

But DEQ did not rest solely on its prior analyses and experience in the

field.  The agency took the additional step of conditioning the certification on

Mountain Valley's compliance with the enhanced measures in the Mitigation

Framework.  JA2, JA4, JA6–7.  The Framework's six core elements impose

robust obligations that ensure the Project's instream activities do not violate

water-quality standards.  JA1182–1401.  As DEQ explained, the Framework

stipulates that Mountain Valley must "retain and segregate the streambed

41

materials during trenching and to reinstall the natural substrate post construction." JA556. This process "will reduce sedimentation when MVP removes the temporary stream diversion." JA556. And "[u]nder the requirements of the Mitigation Framework, MVP will return the post construction streams to their original elevations and contours and restore normal flow." JA556; *see also* JA7.

DEQ's reliance on the Mitigation Framework and construction best-management practices was particularly appropriate because those measures ensure that open-cut crossings will produce only *temporary* impacts on Virginia waters. As this Court has affirmed, "minor, short-term issues" do not violate Virginia's water-quality standards. *SWCB*, 898 F.3d at 405. Here, DEQ concluded that "[i]nstallation of a crossing is a *temporary activity* that does not result in any permanent, permitted discharge." JA513 (emphasis added). And with the implementation of the Mitigation Framework, DEQ anticipates only "minimal, temporary increases in turbidity and nominal impacts to downstream resources." JA556. In light of these findings—as well as its extensive prior study and experience in the field—DEQ had ample assurance that the Project "will be conducted in a manner which will not violate water quality standards." 40 C.F.R. §121.2(a)(3) (2019); *SWCB*, 898 F.3d at 405.

42

Ignoring all of this, Petitioners nevertheless insist (at 53) that DEQ "refused" "to evaluate whether MVP's proposed crossings would cause violations of Virginia's narrative criteria." They cite alleged "sediment deposits" and "turbidity" downstream of a previously-completed crossing at the North Fork of the Roanoke River to support this position. But DEQ reviewed those incidents and either contemporaneously identified process improvements or concluded that the subjective reports fell short of water-quality violations. *See* JA763; JA721–727 ("There's really virtually no difference between the upstream and downstream conditions, which …. that's what we're looking for. That's a successful operation when upstream and downstream are the same."); JA730–734 (identifying lessons learned from issue with dewatering structure); JA1106–1114 (photographs of crossing from November 2021 inspection). As part of its certification decision, DEQ also reviewed Mountain Valley's analysis of citizen monitoring at the North Fork of the Roanoke River, which identified three fundamental flaws with those reports—a dearth of pre-construction monitoring information, a failure to consider the impact of variable year-to-year conditions, and an unreliable, highly-subjective data collection method. *See* JA1051–1052. And in its response to comments, DEQ explained that, based on "a consistent almost daily field presence of" DEQ and DEQ-certified third-party inspectors, it "does

43

not agree that there are ongoing, significant violations of erosion and sediment controls or water quality standards." JA515. In short, DEQ fully addressed Petitioners' concerns about turbidity downstream from the North Fork of the Roanoke River, and explained why those subjective reports did not stand in the way of its reasonable-assurance finding.

DEQ also did not "throw up its hands" as Petitioners suggest. In the response to comments Petitioners seize on to construct their entire argument, DEQ merely explained that while it typically uses "data driven indicators," including "dissolved oxygen, pH, temperature … and bacteria," to assess water quality, "[t]here is no methodology to evaluate *short term*, *subjective accounts* of the narrative standard, such as an interference in *recreational activity*." JA514 (emphasis added). Petitioners say (at 55) that this single sentence shows that DEQ "avoided effectively predicting whether stream crossings would violate Virginia's narrative criteria." But that distorts DEQ's statement. As explained above, "short term" instances of increased turbidity or suspended sediments— whether caused by Project construction or a small passing storm—do not violate Virginia's water-quality standards, including the narrative criteria. *SWCB*, 898 F.3d at 405. Such events simply warrant no further review. And even if DEQ could collect and compare data as Petitioners propose, that would not solve the problem of how to validate "subjective accounts" on individual

44

Virginians' "recreational activities." In light of that Sisyphean task, DEQ's decision to rely on tried-and-true construction controls, monitoring, the Mitigation Framework, and several special conditions to assure water quality—instead of novel data collection and modeling efforts—falls well within the zone of reasonableness. *See Prometheus Radio*, 141 S. Ct. at 1158.

At bottom, Petitioners complain that DEQ should have done more, but that does not make DEQ's decision arbitrary or capricious. *Appalachian Voices*, 912 F.3d at 759 ("Governmental agencies can always take additional steps to increase the protection of the environment. But that is not the applicable legal standard this Court utilizes when reviewing a state agency's issuance of a Section 401 Certification."); *Alliance to Save the Mattaponi v. Va. Dep't of Envtl. Quality*, 621 S.E.2d 78, 89 (Va. 2005) ("If the Board were required to wait for the results of all potential studies before making a decision, water protection permits would be issued very rarely, if ever."). In rejecting two separate challenges to Virginia upland 401 certifications, this Court has stressed that "no purpose … would [be] serve[d] by stepping in and second-guessing the analytical methods Virginia deemed appropriate to provide it with reasonable assurance that its water quality would be protected." *SWCB*, 898 F.3d at 407; *Appalachian Voices*, 912 F.3d at 759. So too here. Drawing on over five years of experience monitoring the Project's impacts on water quality, DEQ

45

concluded that a combination of monitoring, time-tested construction methods, the Mitigation Framework, and several special conditions gave it reasonable assurance that the Project will satisfy the narrative criteria. The Court should not step in and second-guess that conclusion in light of the alternative "analytical methods" Petitioners propose.

In any event, Petitioners' proposed methods for assessing narrative water-quality criteria are unworkable. They say (at 58) that DEQ "knew of an available methodology"—the *West Virginia* Stream Condition Index (WVSCI)—for obtaining baseline assessments at crossing locations but just "refused to require or evaluate the necessary data." Not so. DEQ did not collect a complete WVSCI dataset because many streams simply lack the benthic habitat necessary to generate such scores—not because it "refused to" try. *See* JA1205–1206, JA915 n.2.

Petitioners go on to propose (at 59–60) two methods for assessing the Project's effects. Neither is feasible. As for the *Virginia* Stream Condition Index (VSCI) proposal, Petitioners neglect to mention that no pre-construction VSCI data exists for the completed crossings they highlight—thus preventing any possible post-construction comparison. Perhaps sensing this problem, Petitioners also propose modeling. But that idea fares no better. The modeling of *wet* open-cut crossings that Mountain Valley performed in 2017

46

was possible because the company could reasonably assume a consistent flow of water over disturbed construction areas.  For *dry* open-cuts, the company diverts water around the construction area so that no erosive activity should occur at all.  The mobilization of sediment occurs, if at all, during the installation and removal of diversion devices.  Petitioners have cited no method for modeling *that*.

## CONCLUSION

The Court should deny the Petition for Review.

This 27th day of July 2022.

Respectfully Submitted,

 /s/ George P. Sibley, III

George P. Sibley, III
J. Pierce Lamberson
gsibley@hunton.com
plamberson@hunton.com
**HUNTON ANDREWS KURTH LLP**
951 E. Byrd St.
Richmond, VA 23219
(804) 788-8716

Deidre G. Duncan
dduncan@hunton.com
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Ave., NW
Washington, DC 20037
Telephone:  (202) 955-1919

Justin W. Curtis
justin@aqualaw.com
**AQUALAW PLC**
6 South 5th Street
Richmond, Virginia 23219
Telephone:  (804) 716-9021

*Counsel for Mountain Valley Pipeline, LLC*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this filing complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-volume limitations of Fed. R. App. P. 28(b).  This Response Brief contains 9,543 words, excluding the parts of the filing excluded by Fed. R. App. P. 27(d)(2) and 32(f).

/s/ George P. Sibley, III

*Counsel for Mountain Valley Pipeline, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will automatically send e-mail notification of such filing to all counsel of record.

/s/ George P. Sibley, III
*Counsel for Mountain Valley Pipeline, LLC*